Receipt number AUSFCC-10609087

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ANDREA DANZIGER, on behalf of herself and all similarly situated, | |
| *Plaintiffs*, | Case No.:  **25-1241 C** |
| v. | |
| UNITED STATES OF AMERICA, | |
| *Defendant*. | |

## CLASS ACTION COMPLAINT

Plaintiff Andrea Danziger (the "Named Plaintiff"), by and through undersigned counsel, individually and on behalf of all others similarly situated (with the Named Plaintiff, the "Plaintiffs"), alleges as follows:

## NATURE OF THE ACTION

The United States Government procures goods and services from companies and individuals through government contracts.  The Government enjoys certain latitude and discretion in administering its contracts, including the ability to terminate contracts for convenience in the best interest of the Government.  But the Government cannot abuse that discretion nor act in bad faith.  When the Government terminates contractors through illegal acts or offers pretextual justifications for a termination not supported by facts, the Government abuses its discretion and acts in bad faith.

Named Plaintiff was a Personal Services Contractor ("PSC contractor")[1] for the United States Agency for International Development ("USAID"), which was created in 1961 and

---

[1] Throughout this Complaint, "PSC" refers to Personal Services Contracts, and "PSC contractor" refers to the contractor performing the PSC.

responsible for administering civilian foreign aid and development assistance.  Through PSCs, USAID could contract with—rather than directly hire—individuals, who agreed to provide services to USAID.  Thus, beginning in 2021, USAID contracted with Named Plaintiff to provide Humanitarian Assistance Officer functions to overseas countries.  In November 2023, USAID signed a five-year contract with Named Plaintiff.  Named Plaintiff's contract was one of hundreds of similar contracts that USAID entered with various individuals.

In early 2025, the Government attacked USAID and PSC contractors like Named Plaintiff.  Through a farrago of pretextual terminations, top Government officials moved to dismantle the agency and terminate USAID PSC contractors.  Specifically, on February 2, 2025, Elon Musk, head of the newly-formed[2] Department of Government Efficiency (DOGE), wrote on X, formerly known as Twitter: "USAID is a criminal organization.  Time for it to die."  That same day, the Deputy Administrator of USAID (appointed to the position three days earlier) approved the terminations of hundreds of PSC contractors.  Within days, the Government began issuing boilerplate-terminations of USAID's PSC contractors including Named Plaintiff, who received a "Letter of Termination for Convenience" (hereinafter the "Termination Notice") on February 19, 2025.  Between approximately February 12, 2025, and April 24, 2025, USAID terminated hundreds of similarly-situated PSC contractors, through similar boilerplate termination letters.

These "termination" notices did not reflect any exercise of discretion by the cognizant contracting officers ("COs"), as required by contract and regulation.  In fact, many of these terminations were not even signed by the COs.

---

[2] DOGE is not a formal cabinet-level department, which requires an act of Congress.

Although the Government may terminate contracts for convenience, that contractual right is limited.  The Government cannot terminate contracts for convenience in bad faith or by abusing its discretion.  The mass termination of PSC contractors—including Named Plaintiff and those similarly situated—was unlawful, an abuse of discretion, and conducted in bad faith.  The Government's actions here breached hundreds of contracts, entitling improperly terminated PSC contractors to damages above and beyond the compensation typically due under a legitimate termination for convenience.  Collectively, these damages include at least:  (1) lost compensation, and (2) termination costs.

Accordingly, Named Plaintiff, along with other Plaintiffs, submitted certified claims to the cognizant USAID COs seeking damages for the Government's breaches.  Named Plaintiff submitted her certified claim on April 15, 2025.  As of the date of this filing, no Government employee has provided any substantive response to Named Plaintiff's claim.

Named Plaintiff, on behalf of herself and the impacted PSC contractors, hereby seeks compensation under the Contract Disputes Act for the Government's breaches.

## JURISDICTION

1.     Plaintiffs are PSC contractors who received Termination Notices from USAID. The Tucker Act, 28 U.S.C. § 1491 (2009), and the Contracts Disputes Act, 41 U.S.C. §§ 7101-7109, confer jurisdiction to this Court over the actions described in this pleading.  Plaintiffs have filed certified claims with USAID COs, per the Contract Disputes Act's requirements, and the Government has not granted those claims.  Plaintiffs therefore have not received appropriate and proper compensation sought in the certified claims and hereby appeal the Government's decisions.

2.      Named Plaintiff received a Termination Notice on February 19, 2025, and filed a certified claim on April 15, 2025, challenging the termination and seeking damages.  More than sixty (60) days have passed since the CO's receipt of the certified claim; the CO's failure to issue a contracting officer's final decision ("COFD") is, thus, deemed to be a denial of the claim.  41 U.S.C. § 7103(f)(5).  This Court therefore has jurisdiction pursuant to 41 U.S.C. §§ 7101-7109. Named Plaintiff files this Complaint pursuant to 41 U.S.C. § 7104(b) (2011).

## PARTIES

3.      ANDREA DANZIGER is a United States Citizen, a resident of Mason, Ohio, and a former PSC contractor who had contracted with USAID since 2021.  Her latest Contract, No. 720BHA24S00007, was awarded on November 19, 2023, and terminated effective April 20, 2025.

4.      At all times relevant to Plaintiffs' claims, the Defendant, the UNITED STATES OF AMERICA, was acting through the following individuals and entities:

      a.      Donald Trump, President of the United States;

      b.      Marco Rubio, Secretary of the Department of State;

      c.      Elon Musk, Special Government Employee of DOGE;

      d.      DOGE;

      e.      The United States Department of State;

      f.      USAID;

      g.      Peter Marocco, Deputy Administrator of USAID; and

      h.      Jeremy Lewin, Deputy Administrator of USAID.

## CLASS ACTION DEFINITION AND ALLEGATIONS

5.     This action for monetary damages is brought by Named Plaintiff as a class action in accordance with the provisions of the Rules of the Court of Federal Claims ("RCFC") 23(a) and 23(b) on her own behalf and on behalf of the following class of all other similarly situated PSC contractors performing work for USAID, defined as follows:

> All personal services contractors, performing work for USAID, whose contracts were terminated by USAID via Termination Notices issued between February 12, 2025, and April 24, 2025.

6.     The membership of the class is so numerous that joinder of all members is impractical.  Between approximately February 12, 2025, and April 24, 2025, USAID issued Termination Notices to hundreds of PSC contractors.  These notices state that the contracts were terminated "for Convenience of the Government" because the contracts were "no longer in the best interests of the United States Government to continue."[3]  *E.g.*, Exhibit A (Termination Notice).

7.     There are questions of law and fact in the action common to the class, including: (a) whether the Government improperly terminated Plaintiffs' contracts by abusing its discretion, *i.e.*, in furtherance of dismantling USAID in violation of law; (b) whether the Government improperly terminated Plaintiffs' contracts by abusing its discretion and terminating the contracts on the basis of pretextual reason and/or in bad faith; and (c) notwithstanding the improper terminations of Plaintiffs' contracts, whether Plaintiffs are entitled to certain termination costs. The relief sought is common to the entire class.  The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

---

[3] *See* Exhibit A (Termination Notice).

8.     The claim of the Named Plaintiff, who is a representative of the class, is typical of the claims of the class in that all members of the class, including the Named Plaintiff, (1) performed services as PSC contractors for USAID, (2) received Termination Notices issued between approximately February 12, 2025, and April 24, 2025, (3) had their USAID contract terminated as part of the Government's rushed effort to illegally dismantle USAID and without the proper exercise of discretion required for a proper termination, and (4) is due compensation.

9.     The Named Plaintiff is a representative party for all Plaintiffs and will fairly and adequately protect the interests of the class.  The Named Plaintiff is not subject to any unique defenses with respect to the claims raised in this action, and there is no conflict between the Named Plaintiff and other class member Plaintiffs with respect to this action or with respect to the claims for relief.  The Named Plaintiff intends to prosecute this action vigorously to secure remedies for the entire class.

10.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit many similarly-situated PSC contractors to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that would result from repetitive litigation or numerous, separate individual actions.  Class treatment will also permit the adjudication of claims by many class members who otherwise could not afford to litigate the alleged claims, in part because they have been improperly terminated by Defendant's conduct.  This class action presents no difficulties of management that would preclude its maintenance.

11.     Defendant has at all times acted in a manner that has treated all class members similarly, by abusing its discretion or acting in bad faith when terminating each of Plaintiffs'

contracts and failing to pay each of them the compensation owed, thereby making appropriate final relief with respect to the class as whole.

12.     The attorneys for Plaintiffs have decades of experience at the U.S. Court of Federal Claims and are experienced and capable in class action litigation, as well as Contract Disputes Act and Tucker Act claims.  Attorneys for Plaintiffs have successfully represented claimants in other litigation of this nature.

## STATEMENT OF FACTS

### A.     Named Plaintiff's Contract

13.     On November 19, 2023, the Government awarded Contract No. 720BHA24S00007 for Named Plaintiff to perform certain Humanitarian Assistance Officer functions from November 19, 2023, through November 18, 2028.

14.     Like all other contracts held by Plaintiffs, Named Plaintiff's Contract contained a Termination for Convenience provision that stated:

> For the convenience of USAID, by giving not less than 15 calendar days advance written notice to the contractor. Upon such a termination, contractor's right to compensation shall cease when the period specified in such notice expires except that the contractor shall be entitled to any unused vacation leave, return transportation costs and travel allowances and transportation of unaccompanied baggage costs at the rate specified in the contract and subject to the limitations which apply to authorized travel status.

15.     When terminated for convenience, PSC contractors are generally entitled to certain termination costs and other reimbursements including, but not limited to, unused leave costs, relocation costs, travel allowances, material/equipment costs, and other outstanding reimbursements.

16.     On February 19, 2025, the Government issued a Termination Notice, through Patricia Steckler, Acting Branch Chief, notifying Named Plaintiff that the Contract was

terminated "for Convenience of the Government," as it is "no longer in the in the best interests of the United States Government to continue with this contract." Notably, the email correspondence containing the Termination Notice was sent to internal USAID recipients, with Named Plaintiff copied only in the bcc-line. Neither the email nor the Termination Notice identified Named Plaintiff or her contract number.

17.    The Termination Notice further instructed that the termination would be effective on the same day, and that Named Plaintiff's last day of "employment" would be March 6, 2025.

18.    On February 25, 2025, Named Plaintiff acknowledged receipt of the Termination Notice via email to Patricia Steckler. In this email, Named Plaintiff also (1) requested additional information, (2) raised procedural concerns, particularly the lack of any basis for the termination decision, and (3) requested outstanding compensation and reimbursements. The email further requested an extension of the termination date to use accrued leave. The Government never responded to this email.

19.    On March 6, 2025, Named Plaintiff received a "Rescission of Termination Notice for your BHA Personal Services Contract," which revised the termination date to April 20, 2025.

20.    On April 15, 2025, Named Plaintiff submitted her certified claim, claiming lost compensation as well as various termination costs including unused leave, relocation, and other costs.

21.    On June 5, 2025, Named Plaintiff received a lump sum payment reflecting only her annual-leave costs. Named Plaintiff also received payment of her outstanding Standard Form ("SF") 1034, the Public Voucher for Purchases and Services Other Than Personal, that was pending at the time of termination.

22.    To date, Named Plaintiff has not received a COFD regarding her certified claim.

**B.    Congress Established USAID as an Independent Agency**

23.    USAID was created by Executive Order in 1961.  Exec. Order No. 10,973, 26 Fed Reg. 10,469, § 102 (Nov. 7, 1961).

24.    Congress established USAID by statute through the Foreign Assistance Act of 1961 (FAA, Pub. L. 87-195).

25.    In 1998, pursuant to section 1413 of the Foreign Affairs Reform Restructuring Act of 1998 (Pub. L. 105-277, Div. G) ("FARRA"), Congress categorized USAID as an "independent establishment," 5 U.S.C. § 104, outside of the State Department.  22 U.S.C. § 6563 ("Unless abolished pursuant to the reorganization plan submitted under section 6601 of this title, and except as provided in section 6562 of this title, there is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of Title 5").

26.    As an independent agency, USAID has been "the principal U.S. agency responsible for extending development assistance to countries around the world."[4]

**C.    Congress did not Authorize the Dismantling of USAID**

27.    The Constitution vests in Congress the power to create, define, and fund administrative agencies.  U.S. Const. art. I, § 1.[5]

28.    Only Congress may authorize the President to reorganize, abolish, or dissolve administrative agencies.  *Id.*

---

[4] Off. of Inspector Gen., USAID, *OIG Oversight: USAID Overview*, https://oig.usaid.gov/USAID#:~:text=Established%20through%20the%20Foreign%20Assistance ,to%20countries%20around%20the%20world (last accessed July 28, 2025).
[5] *See also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

29.     Historically, when the President has reorganized, abolished, or dismantled administrative agencies, Congress has authorized the President to take such actions.[6]

30.     Since the enactment of FARRA in 1998, Congress has not statutorily authorized the President to reorganize, reconstitute, consolidate, or dismantle USAID.[7]  Indeed, Congress recently and repeatedly reaffirmed, through appropriations, that USAID is an independent agency and that its status cannot lawfully be changed without appropriate congressional action. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, § 7603 (prohibiting appropriated funds for USAID from being used "to implement a reorganization, redesign, or other plan . . . without prior consultation" by the agency head "with the appropriate congressional committees," that  such funds shall be subject to the regular notification procedures of the Committees on Appropriations," and that any such notification must "include a detailed justification for the proposed action"); Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4459, § 7063 (same); Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 49, § 7063 (same); Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, § 7062 (same); Further Consolidated Appropriations Act, 2020, Pub. L. 116-94, 133 Stat. 2534, § 7062 (same); Consolidated Appropriations Act, 2019, Pub. L. 116-6, 133 Stat. 13, § 7073 (same).

---

[6] *See Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449, at *2-4 (U.S. July 8, 2025) (Jackson, J., dissenting) (detailing a century of Congressional consideration or grants of requests from the President to reorganize, abolish, or dismantle administrative agencies).

[7] FARRA provided a 60-day period for the President to submit a reorganization plan and report to Congress.  22 U.S.C. § 6601(a)-(d).  The President did not abolish USAID within the 60-day period.  Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the FARRA, *as contained in* Pub. L. 105-277, 112 Stat. 2681 (1998).

31.     Although proposals have been made to abolish USAID, Congress has failed to enact these proposals.  *See, e.g.*, H.R. 5108, 118th Cong. (2023) (introduced Aug. 1, 2023) (proposed, unenacted bill "[t]o abolish the United States Agency for International Development").

32.     Presently, Congress has not authorized the President to reorganize, abolish, or dismantle USAID.

### D.     USAID Personal Services Contractors

33.     USAID contracts with U.S. citizens—through PSCs—to perform governmental functions, a status recognized by the Federal Acquisition Regulation ("FAR") and other sources. 48 C.F.R. § 37.104 (2010).

34.     Until the mass, indiscriminate terminations at issue here, USAID contracted with more than one thousand PSCs, many of whom were stationed overseas.  These PSC contractors performed vital functions.

35.     USAID's stated mission is to "promote and demonstrate democratic values abroad, and advance a free, peaceful, and prosperous world," and specifically to lead "international development and disaster assistance through partnerships and investments that save lives, reduce poverty, strengthen democratic governance, and help people emerge from humanitarian crises and progress beyond assistance."  In furtherance of these Governmental objectives, USAID PSC contractors provided essential services to various countries.

36.     PSC contractors made up a bulk of the staff in USAID's Bureau for Humanitarian Assistance ("BHA").[8]  BHA is responsible for planning, coordinating, developing, achieving,

---

[8]  USAID Office of Inspector General Advisory Notice highlights the risks and disruptions to the delivery of humanitarian aid resulting from USAID's personnel actions to remove (temporarily or permanently) approximately 90 percent of BHA's workforce.  Off. of Inspector Gen., USAID, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing*

monitoring, and evaluating international humanitarian assistance in two general areas: (1) Humanitarian Response during emergencies—*i.e.*, needs-based humanitarian assistance provided to save lives directed toward the most vulnerable populations, and (2) after emergencies, Early Recovery, Risk Reduction, and Resilience activities to address long-term recovery.

37. PSC contractors were generally placed within one of BHA's seven offices (geographical or support offices) : (1) the Office of Africa; (2) the Office of Asia, Latin America, and the Caribbean; (3) the Office of the Middle East, North Africa, and Europe; (4) the Office of Field and Response Operations; (5) the Office of Technical and Program Quality; (6) the Office of Global Policy, Partnership, Program, and Communications; or (7) the Office of Humanitarian Business and Management Operations.

38. Although PSC contractors could be based in any of these three geographic offices, if based in the United States, PSC contractors were periodically sent to countries in need of assistance. For example, to help the BHA with its mission, United States-based PSC contractors were sent to Egypt, El Salvador, Haiti, Honduras, Kenya, Indonesia, Malawi, Mauritania, Niger, Namibia, Senegal, Togo, Tanzania, the West Bank and Gaza, Zambia, and Zimbabwe. Named Plaintiff was based in the United States but was mainly tasked with supporting Syria. Named Plaintiff was also asked, on a regular basis, to support the USAID team in Ukraine.

39. USAID tasked its PSC contractors with many functions, such as: (1) building contextual knowledge by monitoring humanitarian issues in assigned countries, including identifying opportunities for new programming; (2) tracking emerging disasters; (3) managing,

---

*Reductions and Pause on Foreign Assistance* (Feb. 10, 2025),
https://oig.usaid.gov/sites/default/files/2025-02/USAID%20OIG%20-%20Oversight%20of%20USAID-Funded%20Humanitarian%20Assistance%20Programming%20021025.pdf.

administering, and tracking emergency and/or early recovery, risk-reduction, or resilience-related grants and awards; (4) drafting official U.S. Government communications related to requests for disaster-response assistance; and (5) generally coordinating within USAID, and with other U.S. Government agencies, and external partners.

40.    To meet operational needs during staff shortages, USAID also assigned its PSC contractors to short-term details with other teams within the agency.

41.    Most of the Plaintiffs, including Named Plaintiff, were PSC contractors with the job title of "Humanitarian Assistance Officers" or as members of the Support Relief Group ("SRG").  USAID tasked Humanitarian Assistance Officers with (1) working to alleviate human suffering and (2) reducing the impact of disasters by helping people in need become more self-reliant.  The primary roles of SRG contractors were intermittent backfill for permanent staff overseas, covering vacancies domestically, and responding to numerous disasters worldwide in a timely manner.

42.    PSC contractors also made up a considerable portion of the staff of USAID's Office of Transition Initiatives ("OTI"), which promoted peace and democracy in countries transitioning from authoritarian regimes to democracy.  There were also PSC contractors in other USAID bureaus and offices, such as Global Health ("GH") and Bureau for Democracy, Human Rights, and Governance ("DRG").

**E.    The Department of Government Efficiency**

43.    On January 20, 2025, the President signed Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency.'"[9]  Pursuant to the

---

[9] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) (hereinafter "DOGE Establishment EO").

stated purpose "to implement the President's DOGE Agenda [] to maximize governmental efficiency and productivity," in relevant part, the DOGE Establishment EO provided:

> 1. Establishes "DOGE teams," comprised of at least 4 DOGE employees within each federal agency, including an embedded "DOGE Team member" who can only be hired by the agency "in consultation with" the DOGE Administrator, *id.* at Sec. 3(c). These employees are to "ensure" that their work is "coordinate[d]" with DOGE and "implement[s] the President's DOGE Agenda[,]" *see id.*;

> 2. Orders the commencement of "a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems.  Among other things, the USDS Administrator shall work with Agency Heads to promote interoperability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization[,]" *id.* at Sec. 4(a); and,

> 3. Directs agency leaders to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems[,]" *id.* at 8842, Sec. 4(b).

44.     Pursuant to the DOGE Establishment EO, DOGE teams embedded within various executive agencies, including USAID.  DOGE implemented many termination and wind-down actions across agencies, including terminating employees and contractors, canceling Government grants and contracts, and terminating leases.

45.     The President publicly recognized Elon Musk as the *de facto* head of DOGE.  For example, after the election, around November 12, 2024, the President stated he would appoint Mr. Musk to oversee DOGE.[10]

---

[10] *See, e.g.*, Elena Moore, Camila Domonoske, & Jeongyoon Han, *Trump taps Musk to lead a 'Department of Government Efficiency' with Ramaswamy*, NPR (Nov. 12, 2024), https://www.npr.org/2024/11/12/g-s1-33972/trump-elon-musk-vivek-ramaswamy-doge-government-efficiency-deep-state.

46.    On February 11, 2025, the President and Mr. Musk held a joint press conference in the Oval Office directly related to DOGE and its activities.[11]

47.    During his Presidential Address to Congress, the President stated: "I have created the brand new Department of Government Efficiency.  DOGE.  Perhaps you've heard of it. Which is headed by Elon Musk, who is in the gallery tonight."[12]

48.    DOGE regularly discussed its termination activities on X.  For example, on February 3, 2025 and February 4, 2025, DOGE posted "36 contracts were terminated for a total savings of ~$165mm (sic) across 6 agencies[.]"[13]  DOGE maintains a website showing purported estimated savings through, in part, DOGE's actions related to contract terminations, including terminations of USAID contracts.[14]

49.    Mr. Musk is not now, nor has he ever been, a CO with any agency in the Government.

**F.    The Government Violated the Law When it Dismantled USAID**

50.    Beginning around January 24, 2025, DOGE and the Department of State (State) acted to dismantle USAID.

51.    On January 24, 2025, Secretary Rubio issued a directive pausing "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID."[15]

---

[11] David Ingram, *With Elon Musk watching, Trump says he's giving DOGE even more power*, NBC News (Feb. 11, 2025), https://www.nbcnews.com/politics/doge/elon-musk-trump-doge-executive-order-rcna191751.

[12] The White House, *President Trump Addresses Joint Session of Congress, March 4, 2025*, YouTube, at 41:26 (Mar. 4, 2025), https://www.youtube.com/watch?v=XkFKNkAEzQ8.

[13] *See* Department of Government Efficiency (@DOGE), X, https://x.com/DOGE/ at https://x.com/DOGE/status/1886578681805504608.

[14] *See* Department of Government Efficiency, *Savings*, https://doge.gov/savings (last accessed July 28, 2025).

[15] Exhibit B at 2 (Declaration of Peter Marocco, Feb. 22, 2025).

52.    The same day, DOGE sought access to U.S. Department of the Treasury payment systems to freeze disbursements relating to USAID.[16]

53.    During the week of January 27, 2025, DOGE members began sitting in on USAID staff meetings and asking "detailed questions during meetings about . . . . [USAID] contractors[.]"[17]

54.    DOGE also accessed USAID computer systems.[18]

55.    Furthermore, DOGE removed leadership within USAID.[19]

56.    Peter Marocco became the Director of Foreign Assistance at State on January 20, 2025.  On January 30, he began performing the duties and functions of the Deputy Administrator of USAID.[20]  Upon information and belief, Mr. Marocco was not then, and had never been, a CO for any agency in the Government.

---

[16] Andrew Duehren et al., *Treasury Sought to Freeze Foreign Aid Payments, Emails Show*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/trump-musk-usaid.html.

[17] Jason Leopold et al., *Behind DOGE's Standoff at USAID: Desk Searches and Elon Musk Calling,* Bloomberg News (Feb. 3, 2025), https://www.bloomberg.com/news/articles/2025-02-03/behind-doge-s-standoffat-usaid-desk-searches-and-elon-musk-calling.

[18] *See, e.g.*, Andrew Roth, *DOGE v USAID: how Elon Musk helped his acolytes infiltrate world's biggest aid agency*, The Guardian (Feb. 5, 2025), https://www.theguardian.com/us-news/2025/feb/05/musk-doge-takeover-usaid.

[19] *Id.* ("[Musk and DOGE] demanded the suspensions of dozens of the agency's leading officials, and cajoled and threatened senior USAid (sic) officials to give his acolytes private data and access to restricted areas."); *see also* Margaret Brennan et al., *Two Top Security Officials at USAID Placed on Leave, Sources Say*, CBS News (Feb. 3, 2025), https://www.cbsnews.com/news/usaid-dramatic-changes-security-officials-on-leave ("USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill were put on leave [February 1, 2025].").

[20] Exhibit B at 1 (Declaration of Peter Marocco, Feb. 22, 2025).  Approximately a month and a half after taking the position, Mr. Marocco was succeeded by Jeremy Lewin on March 18 as the Deputy Administrator.  Mr. Lewin had formerly been the DOGE Team Lead at USAID.  Exhibit C at 1 (Mar. 19, 2025).

57.     On or around February 1, the Government blocked USAID staff from accessing their email accounts and took down USAID's main website.[21]

58.     On February 2, without providing supporting facts for their decisions, the President and Mr. Musk announced that USAID would be shut down.  For example, that day, Mr. Musk stated: "USAID was a viper's nest of radical-left marxists (sic) who hate America[.]"[22]  And Mr. Musk announced "USAID is a criminal organization.  Time for it to die."[23]

59.     Later that day, Mr. Musk stated: "So to be clear, in shutting down, which we're in the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, maybe you can take the worm out, but if you've got actually just a ball of worms, it's hopeless.  And USAID is a ball of worms.  There is no apple.  And when there is no apple, you've just got to basically get rid of the whole thing . . . That is why it's got to go, . . . it's beyond repair."[24]

---

[21] *See* Rebecca Heilweil, *USAID website goes dark, staff emails deactivated amid DOGE takeover, source says*, FEDSCOOP (Feb. 2, 2025), https://fedscoop.com/usaid-website-goes-dark-staff-emails-deactivated-amid-doge-takeover-source-says.

[22] Elon Musk (@elonmusk), X (Feb. 2, 2023, 12:04 PM), https://x.com/elonmusk/status/1886098373251301427.

[23] Elon Musk (@elonmusk), X (Feb 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414194835755.

[24] Department of Government Efficiency (@DOGE), X, at 18:32 (Feb 3, 2025, 12:25 AM), https://x.com/DOGE/status/1886284966855647234; *see also* Michael R. Gordon et al., *Marco Rubio Wants USAID to Undergo Overhaul, Backs Off Sudden Shutdown*, The Wall Street Journal (Feb. 3, 2025), https://www.wsj.com/politics/policy/trump-administration-shutters-usaid-headquarters-db3fac7e.

60.     The President echoed this sentiment, stating that USAID has "been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision."[25]

61.     On February 3, Mr. Musk, the White House, and Secretary Rubio publicly reiterated that they were shutting down USAID.[26]

62.      Mr. Musk stated that he had consulted with the President "[w]ith regards to the USAID stuff, I went over it with [the President] in detail and he agreed that we should shut it down."[27]  Mr. Musk stated that "We spent the weekend feeding USAID into the wood chipper (sic)."[28]

63.     The same day, the White House announced that USAID was "unaccountable to taxpayers as it funnels massive sums of money" to "entrenched bureaucrats" for "ridiculous and, in many cases, malicious pet projects [] with next-to-no oversight."  The White House listed purported examples of "WASTE and ABUSE" at USAID.[29]

---

[25] Jennifer Hansler et al., *Elon Musk said Donald Trump agreed USAID needs to be 'shut down'*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge/index.html.

[26] The same day the Government announced USAID would be shut down, Secretary Rubio was appointed as Acting Administrator for the USAID.  *See* Press Release, U.S. Dep't of State, *Secretary Marco Rubio Appointed as Acting Administrator for the United States Agency for International Development (USAID)* (Feb. 3, 2025), https://www.state.gov/secretary-marco-rubio-appointed-as-acting-administrator-for-the-united-states-agency-for-international-development-usaid/.

[27] *See* Hansler, *supra* note 25.

[28] Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM ET), https://x.com/elonmusk/status/1886307316804263979.

[29] White House Article, *At USAID, Waste and Abuse Runs Deep*, The White House (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/at-usaid-waste-and-abuse-runs-deep/.

64.     Secretary Rubio purported to justify the Government's actions at USAID; he stated without providing supporting details that these actions were taken because of "rank insubordination."[30]

65.     Weeks after the initial announcement, the Government continued to justify actions at USAID based on inconsistent, unsupported accusations such as "USAID is really corrupt.  I'll tell you.  It's corrupt.  It's incompetent."[31]  At no time did the Government seek—in any way—to identify which PSC contractors were "corrupt," "incompetent," or "insubordinate" nor did the Government provide support for these allegations.

66.     At no point did Congress authorize anyone to dismantle USAID.[32]  To the contrary, numerous members of Congress stated that the President, DOGE, and Secretary Rubio, **did not** have the authority to dismantle the independent agency:

      a.    A January 31, 2025, letter from Sen. Shaheen, Sen. Schatz, Rep. Meeks, and Rep. Frankel to Mr. Jason Gray, the Acting Administrator of USAID, stated: "USAID is, by statute, an independent establishment outside of the State Department.  Any proposal to modify that structure would require an Act of Congress."[33]

---

[30] Ashleigh Fields, *Rubio accuses USAID of 'rank insubordination'*, The Hill (Feb. 4, 2025), https://thehill.com/policy/international/5124933-marco-rubio-usaid-overhaul-rank-insubordination/.

[31] The White House, *President Trump Signs Executive Orders in the Oval Office, Feb. 11, 2025*, YouTube, at 28:33 (Feb. 12, 2025), https://www.youtube.com/watch?v=L0f-ZAVOoPk.

[32] *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring) ("But I write separately to make clear that my concurrence today should not be seen as an endorsement of the Executive's likely unconstitutional actions in closing USAID, effectively dissolving a 'creature[ ] of statute' that can only be created or destroyed by Congress.").

[33] Hon. Jeanne Shaheen et al., *Ranking Members Shaheen, Schatz, Meeks, Frankel: We Cannot Afford to Take a Timeout from USAID Programs*, Jan. 31, 2025, https://www.foreign.senate.gov/imo/media/doc/shaheen_schatz_meeks_frankel_letter_to_usaid_acting_administrator.pdf.

b.  A February 4, 2025, letter from 37 Senators to Secretary Rubio stated: "The Administration's failure to consult with Congress prior to taking these steps [to dismantle USAID] violates the law[.]"[34]

c.  Senator Collins stated: "The law is every specific and if there's going to be a reorganization of USAID then Congress has to be informed 15 days in advance and a detailed explanation of any changes has to be provided." She further stated that she believed Sec. Rubio's February 3 letter did not satisfy the requirements of the law.[35]

d.  A February 7, 2025, letter from Ranking Member Connolly and Rep. Subramanyam to Secretary Rubio stated: "The Trump Administration is attempting to purge USAID with the intent to eliminate the agency without Congressional authorization."[36]

e.  A February 12, 2025, letter from Rep. Meeks to Secretary Rubio noted that the Administration began illegally dismantling USAID prior to consultation with Congress.[37]

f.  A February 27, 2025, letter from Rep. Frankel, Rep. Meng, Rep. Torres, Rep. Quigley to Secretary Rubio stated that the termination of contracts (without prior consultation with Congress) did not constitute meaningful foreign aid reform or advance U.S. national interests.[38]

---

[34] Sen. Tim Kaine et al., *Kaine Leads 37 Senators in Raising Alarm Over Trump Administration Chaos at Critical National Security Agencies*, Feb. 4, 2025, https://www.kaine.senate.gov/imo/media/doc/2425lettertorubioonusaid.pdf.

[35] Deirdre Walsh, *Republicans in Congress mostly shrug as Musk and DOGE set sights on spending*, NPR (February 5, 2025) https://www.npr.org/2025/02/05/nx-s1-5286426/congress-republicans-musk-doge-usaid.

[36] Rep. Gerald E. Connolly et al., *Ranking Members Connolly and Subramanyam Launch Probe into DOGE Efforts to Purge USAID and Freeze Foreign Aid*, Feb. 7, 2025, https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-02-07.%20GEC%20Subramanyam%20Letter%20to%20Rubio%20on%20USAID%20and%20Aid%20Freeze.pdf.

[37] Rep. Gregory W. Meeks, *Meeks Urges Secretary Rubio to Halt USAID Dismantlement, Demands Congressional Consultation in Line with U.S. Law*, Feb. 12, 2025, https://democrats-foreignaffairs.house.gov/_cache/files/e/2/e2f3c9ce-23f2-4757-8bdb-b6a46b20213a/8BD9154641F8F5CDA27E7A031D62C1780B29C437347AD05FAC021C7A77289CCF.20250211meeksrubio.pdf.

[38] Rep. Lois Frankel et al., *Democratic Members of National Security, Department of State, and Related Programs Appropriations Subcommittee Issue Letter to Secretary Rubio Following Massive USAID Cuts*, Feb. 27, 2025, https://frankel.house.gov/uploadedfiles/letter_to_secretary_rubio_on_foreign_assistance_review_and_terminations.pdf.

G.    **The Government Improperly Terminated PSCs in Furtherance of the Unlawful Dismantling of USAID, Providing Only Pretextual Bases**

67.    The Government's unlawful effort to dismantle USAID included the mass, indiscriminate termination of PSCs.[39]

68.    On February 2, the same day that Mr. Musk called USAID a "viper's nest" and said it was "[t]ime for it to die," USAID authorized terminations of most PSCs.

69.    On February 2, Mr. Marocco, who had been appointed to his USAID position three days earlier, approved the terminations of approximately 800 of the 1,200 PSCs.  Mr. Marocco's stated rationale for the terminations was that the PSCs purportedly "appear to be inconsistent with the mission of USAID and diverts resources away from helping people progress beyond the need for aid."[40]  Mr. Marocco stated that he approved the terminations of the nearly 800 PSCs "that are in high- and middle-income countries like the United States, Moldova and Thailand" because "USAID's mandate is to assist primarily in low-income countries and these contracts appeared to be inconsistent with the mission of USAID."[41]

70.    Mr. Marocco's contemporaneous justification for terminating nearly 800 PSCs based on the physical location of PSC contractors reflected a fundamental misunderstanding of USAID operations.  Although PSC contractors may be physically based in a variety of locations, they provide services to locations other than those in which they are physically located.  For example, Named Plaintiff was located in the United States, but served "low-income countries" such as Syria.

---

[39] *See* Exhibit B at 2 (Declaration of Peter Marocco, Feb. 22, 2025) (explaining that the terminations, placing employees on administrative, restricting access to the USAID office, and other efforts were all taken in conjunction when dismantling USAID).
[40] Exhibit D at 4 (Government Exhibits for Terminations).
[41] Exhibit E at 2 (Declaration of Peter Marocco, Feb. 24, 2025).

71.     Beginning on or about February 19, 2025, Plaintiffs began receiving the Termination Notices, which asserted that the PSCs were terminated "for Convenience of the Government," and "continu[ing the] contract[s]" were "no longer in the best interests of the United States Government[.]"[42]

72.     The Termination Notices are boilerplate letters.  The only differences among these letters were their dates of issuance and the effective termination dates.

73.     Certain later-issued Termination Notices included updated boilerplate language which stated that the termination was "necessary to restructure USAID's operations to better reflect Agency priorities and the foreign policy priorities of the United States.  This termination action does not reflect on your service, performance, or conduct.  It is being taken solely for the reason stated."

74.     Many of these Termination Notices were not issued by the cognizant COs who were responsible for administering and had authority over the respective contracts.

75.     Following the terminations, the Government provided a parade of *post hoc*, pretextual justifications.[43]

76.     For instance, Secretary Rubio claimed, "[t]he 5200 contracts that are now cancelled spent tens of billions of dollars in ways that did not serve, (and in some cases even harmed), the core national interests of the United States."[44]

---

[42] *See* Exhibit A (Termination Notice).

[43] Additionally, the Government has attempted *post hoc* procedural justifications.  On February 3, 2025, following Mr. Marocco's decision to terminate most PSCs, Secretary Rubio submitted a letter to Congress stating only that Mr. Marocco was "begin[ning] the process of engaging in a review of potential reorganization" of USAID.  The letter fails to note that Mr. Marocco (and others) had already started dismantling and reorganizing USAID.

[44] Marco Rubio (@marcorubio), X (March 10, 2025, 4:55 AM), https://x.com/marcorubio/status/1899021361797816325.

77.     The Government has not provided any support as to how the terminated PSC contractors "did not serve" or "harmed" national interests.

78.     Mr. Marocco also provided a list of *post hoc*, pretextual reasons in support of the terminations including purported noncompliance with foreign policy and national interests, a refusal by existing USAID personnel to freeze appropriated funds, and the inability of the remaining USAID officials to review programs.[45]

79.     The Government's terminations of the PSCs were improper and breached the PSCs' contracts because the terminations were based on an unlawful dismantling of USAID and emanated from an abuse of discretion and bad faith towards the Plaintiffs.

80.     This Court, the Federal Circuit, and predecessor courts have long recognized that "[w]hen tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach."[46]

81.     The Government's statements reflected that it acted with animus, motivated by malice, when it terminated the PSCs on the basis of repeated, unsupported assertions that USAID was, for example, a "criminal" organization, "corrupt," wasting taxpayer dollars, and harming national interests.  Based on the nature of the PSC contractors' work and the closeness in time of these Government statements to the terminations of Plaintiffs' contracts, these statements necessarily implicate the PSC contractors that supported USAID and its mission for many years.

---

[45] Exhibit B at 2 (Declaration of Peter Marocco, Feb. 22, 2025).  Mr. Marocco's declaration post-dates the first terminations issued around February 19, 2025.
[46] *Krygoski Const. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (citing 50- and 60-year-old decisions for the proposition that terminations tainted by bad faith or abuse of discretion constitute a breach of contract).

82.    The Government also abused its discretion when it terminated the PSCs.  The COs and other Government personnel that signed the terminations exercised no discretion, the abdication of which weighs in favor of determining the Government abused its discretion.

83.    The only contemporaneous justification for the terminations is a series of erroneous public statements exhibiting animus, and Mr. Marocco's February 2 direction.

84.    Mr. Marocco's February 2 direction was an abuse of discretion because USAID ignored relevant facts and circumstances.  For example, his direction appears to be based on the pretext that PSC contractors were performing work inconsistent with the mission of USAID, and that the location where PSC contractors were stationed represented where the PSC contractors provided aid.  As noted *ante*, this position is incorrect.

85.    In addition, *post hoc* statements about PSC contractors failing to serve and/or harming national interests are inaccurate, unsupported, and similar to comments about USAID "criminal" activities, demonstrate the Government's animus towards PSC contractors and its abuse of discretion.

**H.    The Rescissions Act of 2025 Highlights the Impropriety of the Government's Terminations**

86.    On July 18, 2025, Congress enacted the Rescissions Act of 2025, which was signed by the President on July 24.[47]

87.    The Rescissions Act of 2025 rescinds funds Congress previously appropriated under Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460 and Full-Year Continuing Appropriations Act, 2025, Pub. L. 119–4, 139 Stat. 9.

88.    Congress cannot unbreach an already breached contract.  Any *post hoc* actions by Congress, whether through passage of this law or any other law, do not justify or excuse the

---

[47] Rescissions Act of 2025, Pub. L. 119-28.

President's and the administration's antecedent violations of law and breaches of the PSCs'

contracts.[48]

89.     Additionally, the Rescissions Act of 2025 does not remedy the PSC contractors'

injuries caused by the Government's breach.[49]

### CLAIMS FOR RELIEF

### COUNT I

### THE GOVERNMENT'S TERMINATIONS WERE IMPROPER AND CONSTITUTE BREACHES OF CONTRACT

90.     Paragraphs 1 through 89 of this Complaint are incorporated into this paragraph as

if fully set forth herein.

91.     The Government breached the contracts by terminating the contracts in abuse of

discretion and bad faith through an unlawful dismantling of a Congressionally-established

independent agency, creating pretextual and unsupported reasons for the terminations, and

exhibiting animus and malice toward the PSC contractors that served USAID.[50]

---

[48] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (Retroactive effect is not available to "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.").

[49] In any event, "[a]lthough a termination for convenience generally does not entitle a contractor to anticipatory profits, a termination for convenience 'tainted by bad faith or an abuse of contracting discretion,' *Krygoski Constr. Co. v. United States*, 94 F.3d at 1541, which amounts to a breach of contract, may entitle a plaintiff to expectancy damages. *Id.* at 1545." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 390 (2013).

[50] In a USAID memo dated July 28, 2025, titled "General Malfeasance by USAID and its Office of Acquisition and Assistance; and Non-Compliance with Laws, Court Orders, and USAID Regulations and Policies since January 24, 2025," Andrea Capellan, Director, Office of Acquisition and Assistance at USAID, states that USAID contracting has been plagued with questionable and potentially illegal orders, including terminations ordered by officials with no authority and terminations made on pretextual bases.

92. Accordingly, the Government improperly terminated Plaintiffs' contracts. The Government's actions constitute breaches of the PSCs.

93. As a result of the Government's breaches of the PSCs, Plaintiffs are entitled to damages in the form of termination costs as well as lost compensation for the remainder of the contract period.

## COUNT II

**THE GOVERNMENT'S TERMINATIONS FOR CONVENIENCE ENTITLE PLAINTIFFS TO TERMINATION COSTS, WHICH THE GOVERNMENT FAILED TO PAY IN VIOLATION OF ITS CONTRACTUAL AND REGULATORY OBLIGATIONS**

94. Paragraphs 1 through 93 of this Complaint are incorporated into this paragraph as if fully set forth herein.

95. Pursuant to the terms of the PSCs and FAR Part 52, the Government's terminations of the PSCs for convenience entitle Plaintiffs to various termination costs including unused leave costs, relocation costs, travel allowances, material/equipment costs, and other outstanding reimbursements.

96. Plaintiffs are entitled to all termination costs even if the Government's terminations did not constitute a breach of contract.

### PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that the court:

1. ENTER a preliminary order (a) CERTIFYING a class consisting of all PSC contractors, performing work for USAID, whose contracts were terminated by USAID via a Termination letter issued between February 12, 2025, and April 24, 2025, and who filed certified claims which were not granted, and (b) AWARDING breach damages to all class members to compensate for all damages related to the

unlawful terminations of their contracts with USAID including both lost

compensation as well as all termination costs; and

2. PROVIDE such additional relief, on an interim basis or otherwise, as may be

   appropriate to protect Plaintiffs' rights under their contracts with USAID.

3. IN THE ALTERNATIVE, should the court find that the terminations of these

   contracts were not unlawful, a preliminary order (a) CERTIFYING a class consisting

   of all PSC contractors, performing work for USAID, whose contracts were terminated

   by USAID via the Termination letter issued between February 12, 2025, and April 24,

   2025, and (b) AWARDING damages to all class members to compensate them for all

   termination costs owed to them under their contracts.


Dated: July 28, 2025

                                        Respectfully Submitted,


                                        */s/Stephen J. McBrady*
                                        Stephen J. McBrady
                                        Crowell & Moring LLP
                                        1001 Pennsylvania Avenue NW
                                        Washington, DC 20004
                                        (202) 624-2500
                                        SMcBrady@Crowell.com

                                        ***Attorney for Plaintiffs***

**Of Counsel:**
Charles Baek
Josh Sohn
Sharmistha Das
Eric Herendeen

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004