## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ANDREA DANZIGER, DEBORAH MURPHY, MARK HERZBERG, KENNETH SKLAW, individually, and on behalf of all others similarly situated, | Case No. 25-1241 (Judge Tapp) |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| *Defendant*. | |

### <u>AMENDED CLASS ACTION COMPLAINT</u>

Stephen J. McBrady

***Of Counsel:***
Charles Baek
Sharmistha Das
Eric Herendeen

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500
SMcBrady@Crowell.com

Joshua Sohn

CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001

***Attorney for Plaintiffs***

Dated: November 18, 2025

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION ................................................................................................................... 3

PARTIES .............................................................................................................................. 4

CLASS ACTION DEFINITION AND ALLEGATIONS .................................................... 5

STATEMENT OF FACTS ................................................................................................... 7

     A.     The Named Plaintiffs' Contracts ........................................................... 7

     B.     Congress Established USAID as an Independent Agency................................. 13

     C.     Congress did not Authorize the Dismantling of USAID .................................... 13

     D.     USAID PSC Contractors..................................................................................... 15

     E.     The Department of Government Efficiency ....................................................... 18

     F.     The Government Violated the Law When it Dismantled USAID ...................... 20

     G.     The Government Improperly Terminated PSCs in Furtherance of the
             Unlawful Dismantling of USAID, Providing Only Pretextual Bases................. 25

     H.     The Rescissions Act of 2025 Highlights the Impropriety of the
             Government's Terminations ................................................................................ 31

CLAIMS FOR RELIEF ...................................................................................................... 32

     COUNT I ...................................................................................................................... 32

           THE GOVERNMENT'S TERMINATIONS WERE IMPROPER AND
           CONSTITUTE BREACHES OF CONTRACT ................................................. 32

     COUNT II ..................................................................................................................... 33

           THE GOVERNMENT'S TERMINATIONS FOR CONVENIENCE
           ENTITLE PLAINTIFFS TO TERMINATION COSTS, WHICH THE
           GOVERNMENT FAILED TO PAY IN VIOLATION OF ITS
           CONTRACTUAL AND REGULATORY OBLIGATIONS ............................. 33

PRAYER FOR RELIEF ...................................................................................................... 33

TABLE OF EXHIBITS ....................................................................................................... 35

## **<u>TABLE OF AUTHORITIES</u>**

**CASES**

*Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) .......................... 23

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258 (2013) ............................ 32

*Krygoski Const. Co. v. United States*, 94 F.3d 1537 (Fed. Cir. 1996) ................................... 30, 32

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ...................................................................... 31

**STATUTES**

22 U.S.C. § 6563 ........................................................................................................................... 13

41 U.S.C. §§ 7101-7109 ............................................................................................................ 3, 4

5 U.S.C. § 104 ............................................................................................................................... 13

Consolidated Appropriations Act, 2019, Pub. L. 116-6, 133 Stat. 13 (2019) .............................. 14

Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182 (2020) ...................... 14

Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 49 (2022) .......................... 14

Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4459 (2022) ...................... 14

Foreign Affairs Reform Restructuring Act of 1998, Pub. L. 105-277, 112 Stat 2681 (1998) 13, 14

Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424 (1961) .................................. 12

Full-Year Continuing Appropriations Act, 2025, Pub. L. 119–4, 139 Stat. 9 (2025) ................. 31

Further Consolidated Appropriations Act, 2020, Pub. L. 116-94, 133 Stat. 2534 (2019) ............ 14

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460 (2024) ........ 14, 31

H.R. 5108 ...................................................................................................................................... 14

Rescissions Act of 2025, Pub. L. 119-28, 139 Stat 467 (2025) ................................................... 31

**OTHER AUTHORITIES**

Exec. Order No. 10,973, 26 F.R. 10,469 (1961)........................................................................ 12

Exec. Order No. 14158, 90 F.R. 8441 (2025)................................................................. 17, 18

**RULES**

RCFC 23 ............................................................................................................................... 5

**REGULATIONS**

48 C.F.R. § 37.104 ................................................................................................................ 15

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 1............................................................................................................. 13

Plaintiffs Andrea Danziger, Deborah Murphy, Mark Herzberg, and Kenneth Sklaw (together, the "Named Plaintiffs"), by and through undersigned counsel, individually and on behalf of all others similarly situated (with the Named Plaintiffs, the "Plaintiffs"), allege as follows:

## NATURE OF THE ACTION

The United States Government procures goods and services from companies and individuals through government contracts.  The Government enjoys certain latitude and discretion in administering its contracts, including the ability to terminate contracts for convenience in the best interest of the Government.  But the Government cannot abuse that discretion nor act in bad faith.  When the Government terminates contractors through unlawful acts or offers pretextual justifications for a termination not supported by facts, the Government abuses its discretion and acts in bad faith.

Named Plaintiffs were Personal Services Contractors ("PSC contractors")[1] for the United States Agency for International Development ("USAID"), which was created in 1961 and responsible for administering civilian foreign aid and development assistance.  Through PSCs, USAID could contract with—rather than directly hire—individuals, who agreed to provide services to USAID.  Thus, USAID contracted with Named Plaintiffs to provide functions like Humanitarian Assistance Officer and Technical Program Officer supporting overseas work. Between 2022 and 2023, USAID signed contracts with 5-year periods of performance with Named Plaintiffs.  The Named Plaintiffs' contracts are examples of hundreds of similar contracts that USAID entered with various individuals.

---

[1] Throughout this Complaint, "PSC" refers to Personal Services Contracts, and "PSC contractor" refers to the contractor performing the PSC.

In early 2025, the Government attacked USAID and PSC contractors like Named

Plaintiffs.  Through a farrago of pretextual terminations, top Government officials moved to

dismantle the agency and terminate USAID PSCs.  Specifically, on February 2, 2025, Elon

Musk, head of the newly-formed Department of Government Efficiency ("DOGE"),[2] wrote on X,

formerly known as Twitter: "USAID is a criminal organization.  Time for it to die."  That same

day, the Deputy Administrator of USAID (appointed to the position three days earlier) approved

the terminations of hundreds of PSCs.  Within weeks, the Government began issuing boilerplate-

terminations of USAID's PSCs.  Named Plaintiffs each received a "Letter of Termination for

Convenience" (hereinafter the "Termination Notice") on February 19, 2025, March 3, 2025, or

April 3, 2025, respectively.  Between approximately February 12, 2025, and April 24, 2025,

USAID terminated hundreds of similarly-situated PSCs through similar boilerplate termination

letters.

These termination notices did not reflect any exercise of discretion by the cognizant

contracting officers ("COs"), as required by contract and regulation.  In fact, many of these

terminations were not even signed by the COs.

Although the Government may terminate contracts for convenience, that contractual right

is limited.  The Government cannot terminate contracts for convenience in bad faith or by

abusing its discretion.  The mass termination of PSC contractors—including Named Plaintiffs

and those similarly situated—was unlawful, an abuse of discretion, and conducted in bad faith.

The Government's actions here breached hundreds of contracts, entitling improperly terminated

PSC contractors to damages above and beyond the compensation typically due under a legitimate

---

[2] DOGE is not a formal cabinet-level department, which requires an act of Congress.

termination for convenience.  Collectively, these damages include at least: (1) lost compensation, and (2) termination costs.

Accordingly, Named Plaintiffs submitted certified claims to the cognizant USAID COs seeking damages for the Government's breaches.  As of the date of this filing, the Government has denied their claims as deemed denials.

Named Plaintiffs, on behalf of themselves and the impacted PSC contractors, hereby seek compensation under the Contract Disputes Act for the Government's breaches.

## JURISDICTION

1.      Plaintiffs are PSC contractors who received Termination Notices from USAID. The Tucker Act, 28 U.S.C. § 1491, and the Contracts Disputes Act, 41 U.S.C. §§ 7101-7109, confer jurisdiction to this Court over the actions described in this pleading.  Per the requirements of the Contract Disputes Act, Plaintiffs have filed certified claims with USAID COs, and the Government has not granted those claims.  Plaintiffs therefore have not received appropriate and proper compensation sought in the certified claims and hereby appeal the Government's decisions.

2.      Ms. Danziger received a Termination Notice on February 19, 2025, and filed a certified claim on April 15, 2025, challenging the termination and seeking damages.  *See* Ex. A (Ms. Danziger's Termination Notice); *see also*, Ex. F (Ms. Danziger's Certified Claim).  More than sixty (60) days have passed since the CO's receipt of the certified claim.  The CO's failure to issue a Contracting Officer's Final Decision ("COFD") is thus deemed to be a denial of the claim.  41 U.S.C. § 7103(f)(5).

3.      Ms. Murphy received a Termination Notice on March 3, 2025, and filed a certified claim on June 16, 2025, challenging the termination and seeking damages.  *See* Ex. G (Ms. Murphy's Termination Notice); *see also* Ex. H (Ms. Murphy's Certified Claim).  More than

sixty (60) days have passed since the CO's receipt of the certified claim. The CO's failure to issue a COFD is thus deemed to be a denial of the claim. 41 U.S.C. § 7103(f)(5).

4.      Mr. Herzberg received a Termination Notice on April 3, 2025, and filed a certified claim around August 12, 2025, challenging the termination and seeking damages. *See* Ex. I (Mr. Herzberg's Termination Notice); *see also* Ex. J (Mr. Herzberg's Certified Claim). More than sixty (60) days have passed since the CO's receipt of the certified claim. The CO's failure to issue a COFD is thus deemed to be a denial of the claim. 41 U.S.C. § 7103(f)(5).

5.      Mr. Sklaw received a Termination Notice on February 19, 2025, and filed a certified claim on September 15, 2025, challenging the termination and seeking damages. *See* Ex. K (Mr. Sklaw's Termination Notice); *see also* Ex. L (Mr. Sklaw's Certified Claim). More than sixty (60) days have passed since the CO's receipt of the certified claim. The CO's failure to issue a COFD is thus deemed to be a denial of the claim. 41 U.S.C. § 7103(f)(5).

6.      Each of Named Plaintiffs' claims have been denied by the Government. Therefore, this Court has jurisdiction pursuant to 41 U.S.C. §§ 7101-7109. The Named Plaintiffs file this Complaint pursuant to 41 U.S.C. § 7104(b) (2011).

## PARTIES

7.      ANDREA DANZIGER is a United States Citizen, a resident of Mason, Ohio, and a former PSC contractor. Her latest Contract, No. 720BHA24S00007, was awarded around November 16, 2023, and terminated effective April 20, 2025.

8.      DEBORAH MURPHY is a United States Citizen, a resident of Hudson, NY, and a former PSC contractor. Her Contract, No. 720BHA24S00014, was awarded around November 28, 2024, and terminated effective April 17, 2025.

9.      MARK HERZBERG is a dual citizen of the United States and Israel, a resident of Israel, and a former PSC contractor.  His Contract, No. 72029422S00001, was awarded on June 22, 2022, and terminated effective September 2, 2025.

10.      KENNETH SKLAW is a United States Citizen, a resident of Vermont, and a former PSC contractor.  His Contract, No. 7200AA22S00013, was awarded on August 24, 2022, and terminated effective March 6, 2025.

11.      At all times relevant to Plaintiffs' claims, the Defendant, the UNITED STATES OF AMERICA, was acting through the following individuals and entities:

      a.      Donald Trump, President of the United States;

      b.      Marco Rubio, Secretary of the Department of State;

      c.      Elon Musk, Special Government Employee of DOGE;

      d.      DOGE;

      e.      The United States Department of State;

      f.      USAID;

      g.      Peter Marocco, Deputy Administrator of USAID; and

      h.      Jeremy Lewin, Deputy Administrator of USAID.

## CLASS ACTION DEFINITION AND ALLEGATIONS

12.      This action for monetary damages is brought by Named Plaintiffs as a class action in accordance with the provisions of the Rules of the Court of Federal Claims ("RCFC") 23(a) and 23(b) on their own behalf and on behalf of the following class of all other similarly situated PSC contractors performing work for USAID, defined as follows:

> All personal services contractors, performing work for USAID, whose contracts were terminated by USAID via Termination Notices issued approximately between February 12, 2025, and April 24, 2025.

13.     The membership of the class is so numerous that joinder of all members is impractical.  Between approximately February 12, 2025, and April 24, 2025, USAID issued Termination Notices to hundreds of PSC contractors.  These notices state that the contracts were terminated "for Convenience of the Government" because the contracts were "no longer in the best interests of the United States Government to continue."  *See e.g.*, Exs. A, G, I, and K (Named Plaintiffs' Termination Notices).

14.     There are questions of law and fact in the action common to the class, including: (a) whether the Government improperly terminated Plaintiffs' contracts by abusing its discretion, *i.e.*, in furtherance of dismantling USAID in violation of law; (b) whether the Government improperly terminated Plaintiffs' contracts by abusing its discretion and terminating the contracts on the basis of pretextual reason and/or in bad faith; and (c) notwithstanding the improper terminations of Plaintiffs' contracts, whether Plaintiffs are entitled to certain termination costs. The relief sought is common to the entire class.  The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

15.     The claims of the Named Plaintiffs, who represent the class, are typical of the claims of the class in that all members of the class, including the Named Plaintiffs, (1) performed services as PSC contractors for USAID, (2) received Termination Notices issued between approximately February 12, 2025, and April 24, 2025, (3) had their USAID contract terminated as part of the Government's rushed effort to unlawfully dismantle USAID and without the proper exercise of discretion required for a proper termination, and (4) are due compensation.

16.     The Named Plaintiffs are representative of all Plaintiffs and will fairly and adequately protect the interests of the class.  The Named Plaintiffs are not subject to any unique defenses with respect to the claims raised in this action, and there are no conflicts between the

Named Plaintiffs and other class member Plaintiffs with respect to this action or with respect to the claims for relief. The Named Plaintiffs intend to prosecute this action vigorously to secure remedies for the entire class.

17.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit many similarly situated PSC contractors to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that would result from repetitive litigation or numerous, separate individual actions. Class treatment will also permit the adjudication of claims by many class members who otherwise could not afford to litigate the alleged claims, in part because they have been improperly terminated by Defendant's conduct. This class action presents no difficulties of management that would preclude its maintenance.

18.    Defendant has at all times acted in a manner that has treated all class members similarly, by abusing its discretion or acting in bad faith when terminating each of Plaintiffs' contracts and failing to pay each of them the compensation owed, thereby making appropriate final relief with respect to the class as whole.

19.    The attorneys for Plaintiffs have decades of experience at the U.S. Court of Federal Claims and are experienced and capable in class action litigation, as well as Contract Disputes Act and Tucker Act claims. Attorneys for Plaintiffs have successfully represented claimants in other litigation of this nature.

## STATEMENT OF FACTS

### A.    The Named Plaintiffs' Contracts

20.    Each of the Named Plaintiffs was a PSC contractor contracted to work for USAID.

7

21.    Each of the Named Plaintiffs' contracts contained identical Termination for Convenience provisions that stated:

> For the convenience of USAID, by giving not less than 15 calendar days advance written notice to the contractor. Upon such a termination, contractor's right to compensation shall cease when the period specified in such notice expires except that the contractor shall be entitled to any unused vacation leave, return transportation costs and travel allowances and transportation of unaccompanied baggage costs at the rate specified in the contract and subject to the limitations which apply to authorized travel status.

*See* Ex. M at 42, § C(16), Termination (Ms. Danziger's USAID Contract); Ex. N at 39, § C(16), Termination (Ms. Murphy's USAID Contract); Ex. O at 30, § C(15), Termination (Mr. Herzberg's USAID Contract); Ex. P at 40, § C(16), Termination (Mr. Sklaw's USAID Contract).

22.    When terminated for convenience, PSC contractors are generally entitled to certain termination costs and other reimbursements including, but not limited to, unused leave costs, relocation costs, travel allowances, material/equipment costs, and other outstanding reimbursements.

23.    Each of the Named Plaintiffs received Termination Notices stating that their contracts were terminated "for Convenience of the Government," as it was "no longer in the in the best interests of the United States Government to continue" with the contracts.  *See* Exs. A, G, I, and K (Named Plaintiffs' Termination Notices).

24.    Each of the Named Plaintiffs submitted certified claims that the Government denied.

**Andrea Danziger**

25.    Around November 16, 2023, the Government awarded Contract No. 720BHA24S00007 to Ms. Danziger to perform certain Humanitarian Assistance Officer

functions for USAID's Bureau for Humanitarian Assistance ("BHA") from November 19, 2023, through November 18, 2028.  Ex. M (Ms. Danziger's USAID Contract).

26.     Like all other contracts held by Plaintiffs, Ms. Danziger's contract contained the same Termination for Convenience provision as described in ¶ 21 above.

27.     On February 19, 2025, the Government issued a Termination Notice, through Ousay Wahaj, Supervisory Contracting Officer, notifying Ms. Danziger that the Contract was terminated "for Convenience of the Government," as it is "no longer in the in the best interests of the United States Government to continue with this contract."  *See* Ex. A (Ms. Danziger's Termination Notice).  Notably, the email correspondence containing the Termination Notice was sent to internal USAID recipients, with Ms. Danziger copied only in the bcc-line.  Neither the email nor the Termination Notice identified Ms. Danziger or her contract number.

28.     The Termination Notice further instructed that the termination would be effective on the same day, and that Ms. Danziger's last day of "employment" would be March 6, 2025.  *Id.*

29.     On February 25, 2025, Ms. Danziger acknowledged receipt of the Termination Notice via email to Patricia Steckler.  In this email, Ms. Danziger also (1) requested additional information, (2) raised procedural concerns, particularly the lack of any basis for the termination decision, and (3) requested outstanding compensation and reimbursements.  The email further requested an extension of the termination date to use accrued leave.  The Government never responded to this email.

30.     On March 6, 2025, Ms. Danziger received a "Rescission of Termination Notice for [her] BHA Personal Services Contract," which revised the termination date to April 20, 2025.  Ex. Q (Ms. Danziger's Termination Extension).

31.     On April 15, 2025, Ms. Danziger submitted her certified claim, claiming lost compensation as well as various termination costs including unused leave, relocation, and other costs.  *See* Ex. F (Ms. Danziger's Certified Claim).

32.     On June 5, 2025, Ms. Danziger received a lump sum payment reflecting only her annual-leave costs.  Ms. Danziger also received payment of her outstanding Standard Form (SF) 1034, the Public Voucher for Purchases and Services Other Than Personal, that was pending at the time of termination.

33.     To date, Ms. Danziger has not received a COFD regarding her certified claim.

**Deborah Murphy**

34.     Around November 28, 2023, the Government awarded Contract No. 720BHA24S00014 to Ms. Murphy for her to perform certain Senior Regional Humanitarian Program Officer functions for USAID's BHA from December 31, 2023 through December 30, 2028.  *See* Ex. N (Ms. Murphy's USAID Contract).

35.     Like all other contracts held by Plaintiffs, Ms. Murphy's Contract contained the same Termination for Convenience provision described in ¶ 21 above.  *Id.*

36.     On March 3, 2025, the Government issued a Termination Notice, through Acting Branch Chief Steckler, notifying Ms. Murphy that the Contract was terminated "for Convenience of the Government," as it is "no longer in the in the best interests of the United States Government to continue with this contract."  *See* Ex. G (Ms. Murphy's Termination Notice).

37.     The Termination Notice further instructed that the termination would be effective 15 days from the date of the Notice, and that Ms. Murphy's last day of "employment" would be March 18, 2025.  *Id.*

38.      On March 7, 2025, Ms. Murphy received an email regarding "Revision of Termination Notice for [her] BHA Personal Service Contract," from Acting Branch Chief

Steckler, revising the termination date to April 17, 2025.  Ex. R (Ms. Murphy's Termination Extension)

39.    On June 16, 2025, Ms. Murphy submitted her certified claim, claiming lost compensation as well as various termination costs including unused leave.  *See* Ex. H (Ms. Murphy's Certified Claim).

40.    Ms. Murphy has since received a lump sum payment reflecting only her annual-leave costs.

41.    To date, Ms. Murphy has not received a COFD regarding her certified claim.

**Mark Herzberg**

42.    On June 22, 2022, the Government awarded Contract No. 72029422S00001 to Mr. Herzberg for him to perform certain functions as a Deputy Executive Officer in USAID's Executive Office at USAID West Bank and Gaza in Jerusalem from June 24, 2022 through June 23, 2027.  *See* Ex. O (Mr. Herzberg's USAID Contract).

43.    Like all other contracts held by Plaintiffs, Mr. Herzberg's Contract contained the same Termination for Convenience provision described in ¶ 21 above.  *Id*.

44.    On April 3, 2025, the Government issued a Termination Notice, through Contracting/Executive Officer Patricia Audrey Steckler, notifying Mr. Herzberg that the Contract was terminated "for Convenience of the Government," as it is "no longer in the in the best interests of the United States Government to continue with this contract."  *See* Ex. I (Mr. Herzberg's Termination Notice).

45.    The Termination Notice further instructed that the termination would be effective and that Mr. Herzberg's last day of "employment" would be September 2, 2025.  *Id*.

46.     On August 8, 2025, Mr. Herzberg submitted his certified claim, claiming lost compensation as well as various termination costs including unused leave.  *See* Ex. J (Mr. Herzberg's Certified Claim).

47.     On October 8, 2025, Mr. Herzberg received a lump sum payment reflecting only his annual-leave costs.

48.     To date, Mr. Herzberg has not received a COFD regarding his certified claim.

**Kenneth Sklaw**

49.     On August 24, 2022, the Government awarded Contract No. 7200AA22S00013 to Mr. Sklaw for him to perform certain functions as Global Health (Rover IV) Health Development Specialist in the Bureau for Global Health's Office of Country Support from August 29, 2022 through August 28, 2027.  *See* Ex. P (Mr. Sklaw's USAID Contract).

50.     Like all other contracts held by Plaintiffs, Mr. Sklaw's Contract contained the same Termination for Convenience provision described in ¶ 21 above.  *Id*.

51.     On February 19, 2025, the Government issued a Termination Notice, through Contracting Officer Joseph Hamilton, notifying Mr. Sklaw that the Contract was terminated "for Convenience of the Government," as it is "no longer in the in the best interests of the United States Government to continue with this contract."  *See* Ex. K (Mr. Sklaw's Termination Notice).

52.     The Termination Notice further instructed that the termination would be effective 15 days from the date of the Notice, and that Mr. Sklaw's last day of "employment" would be March 6, 2025.  *Id*.

53.     On September 15, 2025, Mr. Sklaw submitted his certified claim, claiming lost compensation as well as unused leave.  *See* Ex. L (Mr. Sklaw's Certified Claim).

54.     On May 29, 2025, Mr. Sklaw received a lump sum payment reflecting only his annual-leave costs.

55.    To date, Mr. Sklaw has not received a COFD regarding his certified claim.

**B.    Congress Established USAID as an Independent Agency**

56.    USAID was created by Executive Order in 1961.  Exec. Order No. 10,973, 26 Fed. Reg. 10,469, § 102 (Nov. 7, 1961).

57.    Congress established USAID by statute through the Foreign Assistance Act of 1961 (FAA, Pub. L. 87-195).

58.    In 1998, pursuant to section 1413 of the Foreign Affairs Reform Restructuring Act of 1998 (Pub. L. 105-277, Div. G) ("FARRA"), Congress categorized USAID as an "independent establishment," 5 U.S.C. § 104, outside of the State Department.  22 U.S.C. § 6563 ("Unless abolished pursuant to the reorganization plan submitted under section 6601 of this title, and except as provided in section 6562 of this title, there is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of Title 5").

59.    As an independent agency, USAID has been "the principal U.S. agency responsible for extending development assistance to countries around the world."[3]

**C.    Congress did not Authorize the Dismantling of USAID**

60.    The Constitution vests in Congress the power to create, define, and fund administrative agencies.  U.S. Const. art. I, § 1.[4]

61.    Only Congress may authorize the President to reorganize, abolish, or dissolve administrative agencies.  *Id.*

---

[3] Off. of Inspector Gen., USAID, *OIG Oversight: USAID Overview*, https://oig.usaid.gov/USAID#:~:text=Established%20through%20the%20Foreign%20Assistance ,to%20countries%20around%20the%20world (last accessed July 3, 2025).
[4] *See also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

62.     Historically, when the President has reorganized, abolished, or dismantled administrative agencies, Congress has authorized the President to take such actions.[5]

63.     Since the enactment of FARRA in 1998, Congress has not statutorily authorized the President to reorganize, reconstitute, consolidate, or dismantle USAID.[6]  Indeed, Congress recently and repeatedly reaffirmed, through appropriations, that USAID is an independent agency and that its status cannot lawfully be changed without appropriate congressional action. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, § 7603 (prohibiting appropriated funds for USAID from being used "to implement a reorganization, redesign, or other plan . . . without prior consultation" by the agency head "with the appropriate congressional committees," that  such funds shall be subject to the regular notification procedures of the Committees on Appropriations," and that any such notification must "include a detailed justification for the proposed action"); Consolidated Appropriations Act, 2023, Pub. L. 117-328, 136 Stat. 4459, § 7063 (same); Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 49, § 7063 (same); Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182, § 7062 (same); Further Consolidated Appropriations Act, 2020, Pub. L. 116-94, 133 Stat. 2534, § 7062 (same); Consolidated Appropriations Act, 2019, Pub. L. 116-6, 133 Stat. 13, § 7073 (same).

---

[5] *See Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174, 2025 WL 1873449, at *2-4 (U.S. July 8, 2025) (Jackson, J., dissenting) (detailing a century of Congressional consideration or grants of requests from the President to reorganize, abolish, or dismantle administrative agencies).

[6] FARRA provided a 60-day period for the President to submit a reorganization plan and report to Congress.  22 U.S.C. § 6601(a)-(d).  The President did not abolish USAID within the 60-day period.  Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the FARRA, *as contained in* Pub. L. 105-277, 112 Stat. 2681 (1998).

64.    Although proposals have been made to abolish USAID, Congress has failed to enact these proposals. *See, e.g.*, H.R. 5108, 118th Cong. (2023) (introduced Aug. 1, 2023) (proposed, unenacted bill "[t]o abolish the United States Agency for International Development").

65.    Presently, Congress has not authorized the President to reorganize, abolish, or dismantle USAID.

### D.    USAID PSC Contractors

66.    USAID contracts with U.S. citizens—through PSCs—to perform governmental functions, a status recognized by the Federal Acquisition Regulation ("FAR") and other sources. 48 C.F.R. § 37.104 (2010).

67.    Until the mass, indiscriminate terminations at issue here, USAID contracted with more than one thousand PSCs, many of whom were stationed overseas.  These PSC contractors performed vital functions.

68.    USAID's stated mission is to "promote and demonstrate democratic values abroad, and advance a free, peaceful, and prosperous world," and specifically to lead "international development and disaster assistance through partnerships and investments that save lives, reduce poverty, strengthen democratic governance, and help people emerge from humanitarian crises and progress beyond assistance."[7]  In furtherance of these Governmental objectives, USAID PSC contractors provided essential services to various countries.

---

[7] Department of State and USAID, *USAID's Mission*, https://trumpadministration.archives.performance.gov/state/#:~:text=USAID's%20Mission,%2C%20peaceful%2C%20and%20prosperous%20world. (last accessed October 19, 2025).

69.     PSC contractors made up a bulk of the staff in USAID's BHA.[8]  BHA is responsible for planning, coordinating, developing, achieving, monitoring, and evaluating international humanitarian assistance in two general areas: (1) Humanitarian Response during emergencies—*i.e.*, needs-based humanitarian assistance provided to save lives directed toward the most vulnerable populations, and (2) after emergencies, Early Recovery, Risk Reduction, and Resilience activities to address long-term recovery.

70.     PSC contractors were generally placed within one of BHA's seven offices (geographical or functional/technical offices) : (1) the Office of Africa; (2) the Office of Asia, Latin America, and the Caribbean; (3) the Office of the Middle East, North Africa, and Europe; (4) the Office of Field and Response Operations ("FARO"); (5) the Office of Technical and Program Quality ("TPQ"); (6) the Office of Global Policy, Partnership, Program, and Communications ("G3PC"); or (7) the Office of Humanitarian Business and Management Operations ("HBMO").

71.     Although PSC contractors could be based in various geographic locations, PSC contractors supported projects in and traveled to locations outside of the places in which they were based.

72.     For example, Ms. Danziger was based in the United States but worked with the BHA Syria team, supporting projects in Syria, and, at times, the Ukraine team.

---

[8] USAID Office of Inspector General Advisory Notice highlights the risks and disruptions to the delivery of humanitarian aid resulting from USAID's personnel actions to remove (temporarily or permanently) approximately 90 percent of BHA's workforce.  Off. of Inspector Gen., USAID, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* (Feb. 10, 2025), https://oig.usaid.gov/sites/default/files/2025-02/USAID%20OIG%20-%20Oversight%20of%20USAID-Funded%20Humanitarian%20Assistance%20Programming%20021025.pdf.

73.     Ms. Murphy was based in Budapest, Hungry but performed support work for Yemen and Iraq.

74.     Mr. Herzberg was based in Israel for safety and security reasons but supported work in Gaza and the West Bank.

75.     Mr. Sklaw was based in the Washington, D.C. but performed support work in Kazakhstan, Burma, Papua New Guinea, Sierra Leone, Nigeria, and Vietnam.

76.     Many other PSC contractors who were based in the United States or other offices supported teams either based in or focused on many other countries, including Afghanistan, Iraq, Lebanon, Malawi, Somalia, Sudan, Yemen, and Zambia.  PSC contractors also supported work in regions that experienced conflict like the West Bank, Gaza, and Nagorno-Karabakh.

77.     USAID tasked its PSC contractors with many functions, such as: (1) building contextual knowledge by monitoring humanitarian issues in assigned countries, including identifying opportunities for new programming; (2) tracking emerging disasters; (3) managing, administering, and tracking emergency and/or early recovery, risk-reduction, or resilience-related grants and awards; (4) drafting official U.S. Government communications related to requests for disaster-response assistance; and (5) generally coordinating within USAID, and with other U.S. Government agencies, and external partners.

78.     To meet operational needs during staff shortages, USAID also assigned its PSC contractors to short-term details with other teams within the agency.

79.     USAID also contracted with PSC contractors for other USAID offices and bureaus, such as the Office of Transition Initiatives ("OTI"), the Bureau for Global Health ("GH"), and the Bureau for Democracy, Human Rights, and Governance ("DRG").

E.    **The Department of Government Efficiency**

80.    On January 20, 2025, the President signed Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency.'"  Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) (hereinafter "DOGE Establishment EO").  Pursuant to the stated purpose "to implement the President's DOGE Agenda [] to maximize governmental efficiency and productivity," in relevant part, the DOGE Establishment EO provided:

> 1. Establishes "DOGE teams," comprised of at least 4 DOGE employees within each federal agency, including an embedded "DOGE Team member" who can only be hired by the agency "in consultation with" the DOGE Administrator, *id.* at Sec. 3(c). These employees are to "ensure" that their work is "coordinate[d]" with DOGE and "implement[s] the President's DOGE Agenda[,]" *see id.*;
>
> 2. Orders the commencement of "a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems.  Among other things, the USDS Administrator shall work with Agency Heads to promote interoperability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization[,]" *id.* at Sec. 4(a); and,
>
> 3. Directs agency leaders to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems[,]" *id*. at 8842, Sec. 4(b).

*Id*.

81.    Pursuant to the DOGE Establishment EO, DOGE teams embedded within various executive agencies, including USAID.  DOGE implemented many termination and wind-down actions across agencies, including terminating employees and contractors, canceling Government grants and contracts, and terminating leases.

82. The President publicly recognized Elon Musk as the de facto head of DOGE. For example, after the election, around November 12, 2024, the President stated he would appoint Mr. Musk to oversee DOGE.[9]

83. On February 11, 2025, the President and Mr. Musk held a joint press conference in the Oval Office directly related to DOGE and its activities.[10]

84. During his Presidential Address to Congress, the President stated: "I have created the brand new Department of Government Efficiency. DOGE. Perhaps you've heard of it. Which is headed by Elon Musk, who is in the gallery tonight."[11]

85. DOGE regularly discussed its termination activities on X. For example, on February 3, 2025 and February 4, 2025, DOGE posted "36 contracts were terminated for a total savings of ~$165mm (sic) across 6 agencies[.]"[12] DOGE maintains a website showing purported estimated savings through, in part, DOGE's actions related to contract terminations, including terminations of USAID contracts.[13]

86. Mr. Musk is not now, nor has he ever been, a CO with any agency in the Government.

---

[9] *See, e.g.*, Elena Moore, Camila Domonoske, & Jeongyoon Han, *Trump taps Musk to lead a 'Department of Government Efficiency' with Ramaswamy*, NPR (Nov. 12, 2024), https://www.npr.org/2024/11/12/g-s1-33972/trump-elon-musk-vivek-ramaswamy-doge-government-efficiency-deep-state.

[10] David Ingram, *With Elon Musk watching, Trump says he's giving DOGE even more power*, NBC News (Feb. 11, 2025), https://www.nbcnews.com/politics/doge/elon-musk-trump-doge-executive-order-rcna191751.

[11] The White House, *President Trump Addresses Joint Session of Congress, March 4, 2025*, YouTube, at 41:26 (Mar. 4, 2025), https://www.youtube.com/watch?v=XkFKNkAEzQ8.

[12] *See* Department of Government Efficiency (@DOGE), X, https://x.com/DOGE/ at https://x.com/DOGE/status/1886578681805504608.

[13] *See* Department of Government Efficiency, *Savings*, https://doge.gov/savings (last accessed July 3, 2025).

**F.      The Government Violated the Law When it Dismantled USAID**

87.      Beginning around January 24, 2025, DOGE and the Department of State ("State") acted to dismantle USAID.

88.      On January 24, 2025, Secretary Rubio issued a directive pausing "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID."  Ex. B at 14 (Excerpt of Declaration of Peter Marocco, Feb. 22, 2025).

89.      The same day, DOGE sought access to U.S. Department of the Treasury payment systems to freeze disbursements relating to USAID.[14]

90.      During the week of January 27, 2025, DOGE members began sitting in on USAID staff meetings and asking "detailed questions during meetings about . . . . [USAID] contractors[.]"[15]

91.      DOGE also accessed USAID computer systems.[16]

92.      Furthermore, DOGE removed leadership within USAID.[17]

---

[14] Andrew Duehren et al., *Treasury Sought to Freeze Foreign Aid Payments, Emails Show*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/trump-musk-usaid.html.

[15] Jason Leopold et al., *Behind DOGE's Standoff at USAID: Desk Searches and Elon Musk Calling,* Bloomberg News (Feb. 3, 2025), https://www.bloomberg.com/news/articles/2025-02-03/behind-doge-s-standoffat-usaid-desk-searches-and-elon-musk-calling.

[16] *See, e.g.*, Andrew Roth, *DOGE v USAID: how Elon Musk helped his acolytes infiltrate world's biggest aid agency*, The Guardian (Feb. 5, 2025), https://www.theguardian.com/us-news/2025/feb/05/musk-doge-takeover-usaid.

[17] *Id.* ("[Musk and DOGE] demanded the suspensions of dozens of the agency's leading officials, and cajoled and threatened senior USAid (sic) officials to give his acolytes private data and access to restricted areas."); *see also* Margaret Brennan et al., *Two Top Security Officials at USAID Placed on Leave, Sources Say*, CBS News (Feb. 3, 2025), https://www.cbsnews.com/news/usaid-dramatic-changes-security-officials-on-leave ("USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill were put on leave [February 1, 2025].").

93.     Peter Marocco became the Director of Foreign Assistance at State on January 20,

2025.  On January 30, according to Mr. Marocco's affidavits in multiple cases, he began

performing the duties and functions of the Deputy Administrator of USAID.  Ex. B at 2 (Excerpt

of Declaration of Peter Marocco, Feb. 22, 2025).[18]  However, it is unclear on what date Mr.

Marocco was formally delegated authority as Deputy Administrator of USAID.  *See* Ex. S at 3-4

(Excerpt of Memo. Op., Case No. 8:25-cv-00462-TDC (D. Md. Aug. 13, 2025)) (noting that the

record is unclear about the dates on which Mr. Marocco was formally delegated his authorities,

despite Mr. Marocco's numerous affidavits in numerous cases).  Upon information and belief,

Mr. Marocco was not then, and had never been, a CO for any agency in the Government.

94.     On or around February 1, the Government blocked USAID staff (and, relatedly,

PSC contractors) from accessing their email accounts and took down USAID's main website.[19]

95.     On February 2, without providing supporting facts for their decisions, the

President and Mr. Musk announced that USAID would be shut down.  For example, that day, Mr.

Musk stated: "USAID was a viper's nest of radical-left marxists (sic) who hate America[.]"[20]

And Mr. Musk announced "USAID is a criminal organization.  Time for it to die."[21]

96.     Later that day, Mr. Musk stated: "So to be clear, in shutting down, which we're in

the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to

---

[18] Approximately a month and a half after taking the position, Mr. Marocco was succeeded by Jeremy Lewin on March 18 as the Deputy Administrator.  Mr. Lewin had formerly been the DOGE Team Lead at USAID.  Ex. C at 2 (Excerpt of Declaration of Jeremy Lewin, March 19, 2025).

[19] *See* Rebecca Heilweil, *USAID website goes dark, staff emails deactivated amid DOGE takeover, source says*, FEDSCOOP (Feb. 2, 2025), https://fedscoop.com/usaid-website-goes-dark-staff-emails-deactivated-amid-doge-takeover-source-says.

[20] Elon Musk (@elonmusk), X (Feb. 2, 2023, 12:04 PM), https://x.com/elonmusk/status/1886098373251301427.

[21] Elon Musk (@elonmusk), X (Feb 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414194835755.

do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, maybe you can take the worm out, but if you've got actually just a ball of worms, it's hopeless.  And USAID is a ball of worms.  There is no apple.  And when there is no apple, you've just got to basically get rid of the whole thing . . . That is why it's got to go, . . . it's beyond repair."[22]

97.    The President echoed this sentiment, stating that USAID has "been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision."[23]

98.    On February 3, Mr. Musk, the White House, and Secretary Rubio publicly reiterated that they were shutting down USAID.[24]

99.    Mr. Musk stated that he had consulted with the President "[w]ith regards to the USAID stuff, I went over it with [the President] in detail and he agreed that we should shut it down."[25]  Mr. Musk stated that "We spent the weekend feeding USAID into the wood chipper (sic)."[26]

---

[22] Department of Government Efficiency (@DOGE), X, at 18:32 (Feb 3, 2025, 12:25 AM), https://x.com/DOGE/status/1886284966855647234; *see also* Michael R. Gordon et al., *Marco Rubio Wants USAID to Undergo Overhaul, Backs Off Sudden Shutdown*, The Wall Street Journal (Feb. 3, 2025), https://www.wsj.com/politics/policy/trump-administration-shutters-usaid-headquarters-db3fac7e.

[23] Jennifer Hansler et al., *Elon Musk said Donald Trump agreed USAID needs to be 'shut down'*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge/index.html.

[24] The same day the Government announced USAID would be shut down, Secretary Rubio was appointed as Acting Administrator for the USAID.  *See* Press Release, U.S. Dep't of State, *Secretary Marco Rubio Appointed as Acting Administrator for the United States Agency for International Development (USAID)* (Feb. 3, 2025), https://www.state.gov/secretary-marco-rubio-appointed-as-acting-administrator-for-the-united-states-agency-for-international-development-usaid/.

[25] *See* Hansler, *supra* note 23.

[26] Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM ET), https://x.com/elonmusk/status/1886307316804263979.

100.    The same day, the White House announced that USAID was "unaccountable to taxpayers as it funnels massive sums of money" to "entrenched bureaucrats" for "ridiculous and, in many cases, malicious pet projects [] with next-to-no oversight."  The White House listed purported examples of "WASTE and ABUSE" at USAID.[27]

101.    Secretary Rubio purported to justify the Government's actions at USAID; he stated without providing supporting details that these actions were taken because of "rank insubordination."[28]

102.    Weeks after the initial announcement, the Government continued to justify actions at USAID based on inconsistent, unsupported accusations such as "USAID is really corrupt.  I'll tell you.  It's corrupt.  It's incompetent."[29]  At no time did the Government seek—in any way—to identify which PSC contractors were "corrupt," "incompetent," or "insubordinate" nor did the Government provide support for these allegations.

103.    At no point did Congress authorize anyone to dismantle USAID. [30]  To the contrary, numerous members of Congress stated that the President, DOGE, and Secretary Rubio, **did not** have the authority to dismantle the independent agency:

  a. A January 31, 2025, letter from Sen. Shaheen, Sen. Schatz, Rep. Meeks, and Rep. Frankel to Mr. Jason Gray, the Acting Administrator of USAID, stated: "USAID is, by statute, an independent establishment outside of the

---

[27] White House Article, *At USAID, Waste and Abuse Runs Deep*, The White House (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/at-usaid-waste-and-abuse-runs-deep/.
[28] Ashleigh Fields, *Rubio accuses USAID of 'rank insubordination'*, The Hill (Feb. 4, 2025), https://thehill.com/policy/international/5124933-marco-rubio-usaid-overhaul-rank-insubordination/.
[29] The White House, *President Trump Signs Executive Orders in the Oval Office, Feb. 11, 2025*, YouTube, at 28:33 (Feb. 12, 2025), https://www.youtube.com/watch?v=L0f-ZAVOoPk.
[30] *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring) ("But I write separately to make clear that my concurrence today should not be seen as an endorsement of the Executive's likely unconstitutional actions in closing USAID, effectively dissolving a 'creature[ ] of statute' that can only be created or destroyed by Congress.").

State Department.  Any proposal to modify that structure would require an Act of Congress."[31]

b.  A February 4, 2025, letter from 37 Senators to Secretary Rubio stated: "The Administration's failure to consult with Congress prior to taking these steps [to dismantle USAID] violates the law[.]"[32]

c.  Senator Collins stated: "The law is every (sic) specific and if there's going to be a reorganization of USAID then Congress has to be informed 15 days in advance and a detailed explanation of any changes has to be provided."  She further stated that she believed Sec. Rubio's February 3 letter did not satisfy the requirements of the law.[33]

d.  A February 7, 2025, letter from Ranking Member Connolly and Rep. Subramanyam to Secretary Rubio stated: "The Trump Administration is attempting to purge USAID with the intent to eliminate the agency without Congressional authorization."[34]

e.  A February 12, 2025, letter from Rep. Meeks to Secretary Rubio noted that the Administration began unlawfully dismantling USAID prior to consultation with Congress.[35]

f.  A February 27, 2025, letter from Rep. Frankel, Rep. Meng, Rep. Torres, Rep. Quigley to Secretary Rubio stated that the termination of contracts

[31] Hon. Jeanne Shaheen et al., *Ranking Members Shaheen, Schatz, Meeks, Frankel: We Cannot Afford to Take a Timeout from USAID Programs*, Jan. 31, 2025, https://www.foreign.senate.gov/imo/media/doc/shaheen_schatz_meeks_frankel_letter_to_usaid_acting_administrator.pdf.

[32] Sen. Tim Kaine et al., *Kaine Leads 37 Senators in Raising Alarm Over Trump Administration Chaos at Critical National Security Agencies*, Feb. 4, 2025, https://www.kaine.senate.gov/imo/media/doc/2425lettertorubioonusaid.pdf.

[33] Deirdre Walsh, *Republicans in Congress mostly shrug as Musk and DOGE set sights on spending*, NPR (February 5, 2025) https://www.npr.org/2025/02/05/nx-s1-5286426/congress-republicans-musk-doge-usaid.

[34] Rep. Gerald E. Connolly et al., *Ranking Members Connolly and Subramanyam Launch Probe into DOGE Efforts to Purge USAID and Freeze Foreign Aid*, Feb. 7, 2025, https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025-02-07.%20GEC%20Subramanyam%20Letter%20to%20Rubio%20on%20USAID%20and%20Aid%20Freeze.pdf.

[35] Rep. Gregory W. Meeks, *Meeks Urges Secretary Rubio to Halt USAID Dismantlement, Demands Congressional Consultation in Line with U.S. Law*, Feb. 12, 2025, https://democrats-foreignaffairs.house.gov/_cache/files/e/2/e2f3c9ce-23f2-4757-8bdb-b6a46b20213a/8BD9154641F8F5CDA27E7A031D62C1780B29C437347AD05FAC021C7A77289CCF.20250211meeksrubio.pdf.

(without prior consultation with Congress) did not constitute meaningful foreign aid reform or advance U.S. national interests.[36]

**G.      The Government Improperly Terminated PSCs in Furtherance of the Unlawful Dismantling of USAID, Providing Only Pretextual Bases**

104.    The Government's unlawful effort to dismantle USAID included the mass, indiscriminate termination of PSCs.  *See* Ex. B at 6-7 (Excerpt of Declaration of Peter Marocco, Feb. 22, 2025) (explaining that the terminations were part of and justified by other actions all taken in conjunction with dismantling USAID); *see also* ECF 9 at 13 ("Ms. Danziger's termination was the result of the reorganization of USAID").

105.    The efforts to dismantle USAID came directly from the President based on the President's "deci[sion] there is corruption and fraud at USAID[.]"  This decision was not based on any specific factual findings.  *See* Ex. T at 4-5 (Excerpt of Hearing re TRO Proceedings (Feb. 9, 2025)).[37]

106.    On February 2, the same day that Mr. Musk called USAID a "viper's nest" and said it was "[t]ime for it to die," USAID authorized terminations of most PSCs.

107.    On February 2, Mr. Marocco approved the terminations of approximately 800 of the 1,200 PSCs.  Mr. Marocco's stated rationale for the terminations was that the PSCs

---

[36] Rep. Lois Frankel et al., *Democratic Members of National Security, Department of State, and Related Programs Appropriations Subcommittee Issue Letter to Secretary Rubio Following Massive USAID Cuts*, Feb. 27, 2025, https://frankel.house.gov/uploadedfiles/letter_to_secretary_rubio_on_foreign_assistance_review_and_terminations.pdf.

[37] During a February 9, 2025 hearing related to proceedings for a temporary restraining order, the Government asserted that it was seeking to immediately place more than 2,000 USAID employees on administrative leave because the "president has decided there is corruption and fraud at USAID."  *See* Ex. T at 4 (Excerpt of Hearing re TRO Proceedings (Feb. 9, 2025)).  The Government could not provide any evidence supporting the President's belief.  The Government acknowledged that the President and Secretary Rubio approved this action and did not provide any reason for the mass action because "[t]here does not have to be one."  *Id.* at 6.  Placing USAID employees on administrative leave and terminating PSCs were both part of the Government's efforts to dismantle USAID.

purportedly "appear to be inconsistent with the mission of USAID and diverts resources away from helping people progress beyond the need for aid."  Ex. D at 4 (Government Exhibits for Terminations).  Mr. Marocco stated that he approved the terminations of the nearly 800 PSCs "that are in high- and middle-income countries like the United States, Moldova and Thailand" because "USAID's mandate is to assist primarily in low-income countries and these contracts appeared to be inconsistent with the mission of USAID."  Ex. E at 3 (Declaration of Peter Marocco, Feb. 24, 2025).

108.    Mr. Marocco's contemporaneous justification for terminating nearly 800 PSCs based on the physical location of PSC contractors reflected a fundamental misunderstanding of USAID operations.  Although PSC contractors may be physically based in a variety of locations, they provide services to locations other than those in which they are physically located.

109.    For example, Ms. Danziger was based in the United States but supported projects in countries like Syria and Ukraine.  *See* ¶ 72 above.

110.    Ms. Murphy was based in Budapest, which acted as a regional office, and Ms. Murphy supported projects in Yemen and Iraq.  *See* ¶ 73 above.

111.    Mr. Herzberg was based in Israel but supported work in Gaza and the West Bank. *See* ¶ 74 above.

112.    Mr. Sklaw was based in the United States but supported work in Kazakhstan, Burma, Papua New Guinea, Sierra Leone, Nigeria, and Vietnam.  *See* ¶ 75 above.

113.    Many other PSC contractors, who were based in the United States or in a regional office located in Egypt; Budapest, Hungary; or Bangkok, Thailand, similarly supported projects in other countries like Yemen, Iraq, Lebanon, Somalia, Sudan, and Afghanistan, Burma or

regions experiencing conflict, like the West Bank, Gaza, and Nagorno-Karabakh. *See* ¶ 76 above.

114.    Thus, Mr. Marocco justified the initial terminations without a connection to the basic facts of the PSC contractors' work.

115.    To effectuate the mass terminations, COs were provided with spreadsheets identifying contracts (and grants and cooperative agreements) and directed to terminate the awards within short amounts of time.

116.    For example, on February 6, 2025, USAID Industry Liaison, Matthew Johnson, directed numerous COs to immediately terminate hundreds of USAID awards.[38] *See* Ex. U at 4-5 (Email re Urgent Action: List of Awards to be Terminated (Feb. 7, 2025)).

117.    In response, a CO asked why the COs were being directed to terminate the contracts and under what authority. *See id.* at 4.

118.    Mr. Johnson stated that he understood "the DOGE team" ordered the terminations taking directions from "the White House, State Department, and Agency leadership." *Id.* at 3.

119.    Subsequently, throughout February 2025, USAID COs received "tranches," i.e., spreadsheets listing awards, that the COs were instructed to terminate immediately, based purportedly on a review conducted by Secretary Rubio and "Agency leadership." *See* Ex. V at 3 (Email re Action Required Termination of Awards for Convenience (Feb. 9, 2025)).

---

[38] In a USAID memo dated July 28, 2025, titled "General Malfeasance by USAID and its Office of Acquisition and Assistance; and Non-Compliance with Laws, Court Orders, and USAID Regulations and Policies since January 24, 2025," the Director, Office of Acquisition and Assistance at USAID and CO, states that USAID contracting has been plagued with questionable and potentially unlawful orders, including terminations ordered by officials with no authority and terminations made on pretextual bases. *See* Ex. X (Public Citizen, Internal USAID Memo: General Malfeasance by USAID and its Office of Acquisition and Assistance (Jul. 28, 2025)). Attached are some of the documents referenced in the General Malfeasance Memo.

120.    Indeed, when directing various COs to terminate thousands of awards under the "tranche" system, the Government justified these terminations based on the premise that Secretary Rubio and Mr. Marocco "personally" reviewed and approved thousands of awards for terminations.  *See* Ex. W at 2 (Email re Follow-Up on [] Award Termination Announcements (Feb. 26, 2025)) ("These awards . . . were personally reviewed and approved for termination by Secretary Rubio and PTDO Deputy Administrator Marocco."); *see* also Ex. Y at 2 (Email re (SUB) Tranche 6 & New Process for Award Terminations (Feb. 25, 2025)) ("Secretary Rubio has reviewed and approved a new tranche of awards to be terminated."); Ex. Z at 3 (Email re For Official Use Only - A&A Award Review Tranche 5 (Feb. 23, 2025)) ("Additional tranches of awards are being reviewed by Secretary Rubio for alignment with Presidential priorities and national interest. . . . These awards were individually reviewed by Secretary Rubio and the USAID Front Office and were determined to be inconsistent with the national interest and Agency priorities.").

121.    According to the Government, Secretary Rubio personally and individually reviewed and approved the termination of approximately 5,800 USAID awards within a two-week period in February 2025.  *See* Ex. AA at 4 (Excerpt of Gov. Statement in Joint Status Rep., Case. No. 1:25-cv-00402-AHA (Feb. 26, 2025)) (the Government asserted that under the tranche system, Secretary Rubio personally and individually approved terminations, within approximately two weeks, of 5,800 USAID awards and 4,100 State awards).

122.    Accordingly, the COs did not exhibit any discretion, but were instead directed to terminate USAID awards *en masse* based on spreadsheets emailed to the COs.

123.    Beginning on or about February 19, 2025, Plaintiffs began receiving the Termination Notices, which asserted that the PSCs were terminated "for Convenience of the

Government," and "continu[ing the] contract[s]" were "no longer in the best interests of the United States Government[.]"  *See, e.g.,* Ex. A (Termination Notice received by Ms. Danziger on February 19, 2025).

124.    The Termination Notices are boilerplate letters based on templates.  The only differences among these letters were their dates of issuance and the effective termination dates.

125.    Certain later-issued Termination Notices included updated boilerplate language which stated that the termination was "necessary to restructure USAID's operations to better reflect Agency priorities and the foreign policy priorities of the United States.  This termination action does not reflect on your service, performance, or conduct.  It is being taken solely for the reason stated."  *See* Ex. BB (Later Issued Termination Notice).

126.    Many of these Termination Notices were not issued by the cognizant COs who were responsible for administering and had authority over the respective contracts.

127.    Following the terminations, the Government provided a parade of post hoc, pretextual justifications.[39]

128.    For instance, Secretary Rubio claimed, "[t]he 5200 contracts that are now cancelled spent tens of billions of dollars in ways that did not serve, (and in some cases even harmed), the core national interests of the United States."[40]

129.    The Government has not provided any support as to how the terminated PSC contractors "did not serve" or "harmed" national interests.

---

[39] Additionally, the Government has attempted *post hoc* procedural justifications.  On February 3, 2025, following Mr. Marocco's decision to terminate most PSCs, Secretary Rubio submitted a letter to Congress stating only that Mr. Marocco was "begin[ning] the process of engaging in a review of potential reorganization" of USAID.  The letter fails to note that Mr. Marocco (and others) had already started dismantling and reorganizing USAID.
[40] Marco Rubio (@marcorubio), X (March 10, 2025, 4:55 AM), https://x.com/marcorubio/status/1899021361797816325.

130.    Mr. Marocco also provided a list of post hoc, pretextual reasons in support of the terminations including purported noncompliance with foreign policy and national interests, a refusal by existing USAID personnel to freeze appropriated funds, and the inability of the remaining USAID officials to review programs.  *See generally* Ex. B at 8-10 (Excerpt of Declaration of Peter Marocco, Feb. 22, 2025).

131.    The Government's terminations of the PSCs were improper and breached the PSCs because the terminations were based on an unlawful dismantling of USAID and emanated from an abuse of discretion and bad faith towards the Plaintiffs.

132.    This Court, the Federal Circuit, and predecessor courts have long recognized that "[w]hen tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach."[41]

133.    The Government's statements reflected that it acted with animus, motivated by malice, when it terminated the PSCs on the basis of repeated, unsupported assertions that USAID was, for example, a "criminal" organization, "corrupt," wasting taxpayer dollars, and harming national interests.  Based on the nature of the PSC contractors' work and the closeness in time of these Government statements to the terminations of Plaintiffs' contracts, these statements necessarily implicate the PSC contractors that supported USAID and its mission for many years.

134.    The Government also abused its discretion when it terminated the PSCs.  The COs and other Government personnel that signed the terminations exercised no discretion, the abdication of which weighs in favor of determining the Government abused its discretion.

---

[41] *Krygoski Const. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996) (citing 50- and 60-year-old decisions for the proposition that terminations tainted by bad faith or abuse of discretion constitute a breach of contract).

135.    The only contemporaneous justification for the terminations is a series of erroneous public statements exhibiting animus, and Mr. Marocco's February 2 direction.

136.    Mr. Marocco's February 2 direction was an abuse of discretion because Mr. Marocco ignored, misstated, and/or failed to consider the basic nature of the work PSC contractors performed.  For example, his direction appears to be based on the pretext that PSC contractors were performing work inconsistent with the mission of USAID, and that the location where PSC contractors were stationed represented where the PSC contractors provided aid.  As noted above, this position is incorrect.

137.    In addition, *post hoc* statements about PSC contractors failing to serve and/or harming national interests are inaccurate, unsupported, and similar to comments about USAID "criminal" activities, demonstrate the Government's animus towards PSC contractors and its abuse of discretion.

**H.    The Rescissions Act of 2025 Highlights the Impropriety of the Government's Terminations**

138.    On July 18, 2025, Congress enacted the Rescissions Act of 2025, which was signed by the President on July 24.[42]

139.    The Rescissions Act of 2025 rescinds funds Congress previously appropriated under Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460 and Full-Year Continuing Appropriations Act, 2025, Pub. L. 119–4, 139 Stat. 9.

140.    Congress cannot un-breach an already breached contract.  Any *post hoc* actions by Congress, whether through passage of this law or any other law, do not justify or excuse the President's and the administration's antecedent violations of law and breaches of the PSCs.[43]

---

[42] Rescissions Act of 2025, Pub. L. 119-28.
[43] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (Retroactive effect is not available to "impair rights a party possessed when he acted, increase a party's liability for past conduct, or

141.    Additionally, the Rescissions Act of 2025 does not remedy the PSC contractors' injuries caused by the Government's breach.[44]

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

### THE GOVERNMENT'S TERMINATIONS WERE IMPROPER AND CONSTITUTE BREACHES OF CONTRACT

142.    Paragraphs 1 through 141 of this Complaint are incorporated into this paragraph as if fully set forth herein.

143.    The Government breached the contracts by terminating the contracts in abuse of discretion and bad faith through an unlawful dismantling of a Congressionally-established independent agency, creating pretextual and unsupported reasons for the terminations, and exhibiting animus and malice toward the PSC contractors that served USAID.

144.    Accordingly, the Government improperly terminated Plaintiffs' contracts.  The Government's actions constitute breaches of the PSCs.

145.    As a result of the Government's breaches of the PSCs, Plaintiffs are entitled to damages in the form of termination costs as well as lost compensation for the remainder of the contract period.

---

impose new duties with respect to transactions already completed.  If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.").

[44] In any event, "[a]lthough a termination for convenience generally does not entitle a contractor to anticipatory profits, a termination for convenience 'tainted by bad faith or an abuse of contracting discretion,' *Krygoski Constr. Co. v. United States*, 94 F.3d at 1541, which amounts to a breach of contract, may entitle a plaintiff to expectancy damages.  *Id.* at 1545." *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 390 (2013).

## COUNT II

**THE GOVERNMENT'S TERMINATIONS FOR CONVENIENCE ENTITLE PLAINTIFFS TO TERMINATION COSTS, WHICH THE GOVERNMENT FAILED TO PAY IN VIOLATION OF ITS CONTRACTUAL AND REGULATORY OBLIGATIONS**

146.    Paragraphs 1 through 145 of this Complaint are incorporated into this paragraph as if fully set forth herein.

147.    Pursuant to the terms of the PSCs and FAR Part 52, the Government's terminations of the PSCs for convenience entitle Plaintiffs to various termination costs including unused leave costs, relocation costs, travel allowances, material/equipment costs, and other outstanding reimbursements.

148.    Plaintiffs are entitled to all termination costs even if the Government's terminations did not constitute a breach of contract.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that the court:

1. ENTER a preliminary order (a) CERTIFYING a class consisting of all PSC contractors, performing work for USAID, whose contracts were terminated by USAID via a Termination letter issued between February 12, 2025, and April 24, 2025, and who filed certified claims which were not granted, and (b) AWARDING breach damages to all class members to compensate for all damages related to the unlawful terminations of their contracts with USAID including both lost compensation as well as all termination costs; and

2. PROVIDE such additional relief, on an interim basis or otherwise, as may be appropriate to protect Plaintiffs' rights under their contracts with USAID.

3. IN THE ALTERNATIVE, should the court find that the terminations of these contracts were not unlawful, a preliminary order (a) CERTIFYING a class consisting

33

of all PSC contractors, performing work for USAID, whose contracts were terminated by USAID via the Termination letter issued between February 12, 2025, and April 24, 2025, and (b) AWARDING damages to all class members to compensate them for all termination costs owed to them under their contracts.

Dated: November 18, 2025

Respectfully Submitted,

*/s/Stephen J. McBrady*
Stephen J. McBrady
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500
SMcBrady@Crowell.com

**Attorney for Plaintiffs**

**Of Counsel:**
Charles Baek
Sharmistha Das
Eric Herendeen

Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500
SMcBrady@Crowell.com

Joshua Sohn

CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|---|---|
| A | Ms. Danziger's Termination Notice, dated Feb. 19, 2025 |
| B | Excerpt of Declaration of Peter Marocco, dated Feb. 22, 2025 |
| C | Excerpt of Declaration of Jeremy Lewin, dated Mar. 19, 2025 |
| D | Excerpt of Government Exhibits for Terminations |
| E | Declaration of Peter Marocco, dated Feb. 24, 2025 |
| F | Ms. Danziger's Certified Claim |
| G | Ms. Murphy's Termination Notice |
| H | Ms. Murphy's Certified Claim |
| I | Mr. Herzberg's Termination Notice |
| J | Mr. Herzberg's Certified Claim |
| K | Mr. Sklaw's Termination Notice |
| L | Mr. Sklaw's Certified Claim |
| M | Ms. Danziger's USAID Contract |
| N | Ms. Murphy's USAID Contract |
| O | Mr. Herzberg's USAID Contract |
| P | Mr. Sklaw's USAID Contract |
| Q | Ms. Danzinger's Termination Extension |
| R | Ms. Murphy's Termination Extension |
| S | Excerpt of Memo. Op., Case No. 8_25-cv-00462-TDC (D. Md. Aug. 13, 2025) |
| T | Excerpt of Hearing re TRO Proceedings, Feb. 9, 2025 |
| U | Email re Urgent Action_ List of Awards to be Terminated, Feb. 7, 2025 |
| V | Email re Action Required Termination of Awards for Convenience, Feb. 9, 2025 |
| W | Email re Follow-Up on [] Award Termination Announcements, Feb. 26, 2025 |
| X | Public Citizen, Internal USAID Memo_ General Malfeasance by USAID and its Office of Acquisition and Assistance, Jul. 28, 2025 |
| Y | Email re (SUB) Tranche 6 & New Process for Award Terminations, Feb. 25, 2025 |
| Z | Email re For Official Use Only - A&A Award Review Tranche 5, Feb. 23, 2025 |
| AA | Excerpt of Gov. Statement in Joint Status Rep., Case. No. 1_25-cv-00402-AHA (Feb. 26, 2025) |
| BB | Later Issued Termination Notice |

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on November 18, 2025, a copy of the foregoing amended complaint was

filed electronically using the Court's Electronic Case Filing ("ECF") system.  I understand that

notice of this filing will be served on Defendant's Counsel via the Court's ECF system.


<u>/s/Stephen J. McBrady</u>
Stephen J. McBrady
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500
SMcBrady@Crowell.com