No. 25-1241

(Judge Tapp)

---

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

ANDREA DANZIGER,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

## DEFENDANT'S MOTION TO DISMISS

---

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

MARTIN F. HOCKEY, JR.
Deputy Director

OF COUNSEL
Rachel B. Cochran
Assistant General Counsel
U.S. Agency for Int'l Development

STEPHANIE A. FLEMING
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0170
Facsimile: (202) 305-2062
Stephanie.Fleming@usdoj.gov

*Attorneys for Defendant*

Dated:  December 9, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

BACKGROUND ...................................................................................................... 2

I.    The Termination for Convenience Cost Claims ................................................ 3

II.   The Bad Faith Claims ...................................................................................... 7

ARGUMENT .......................................................................................................... 8

I.    The Plaintiffs' Complaint Fails to Allege a Claim For Which Relief Can Be
      Granted........................................................................................................... 8

      A.  Standard of Review..................................................................................... 8

      B.  The Plaintiffs Fail to Sufficiently Allege "Bad Faith" or "Abuse of Discretion"
          in the Termination of Their Contracts. (Count I)......................................... 8

      C.  The Plaintiffs Do Not Sufficiently Allege That the Government Breached
          the Termination Clause of Their Contracts, as They Admit Costs Which Are
          Due Under That Clause Have Been Paid. (Count II).................................... 13

      D.  The Named Plaintiffs Have Failed to Sufficiently Allege a Class Action or That
          They Are "Similarly Situated" to All Other PSC Contractors..................... 18

CONCLUSION........................................................................................................ 21

## TABLE OF AUTHORITIES

Cases

*Acceptance Ins. Cos., Inc. v. United States,*
    583 F.3d 849 (Fed. Cir. 2009) ........................................................................ 8

*Am-Pro Protective Agency, Inc. v. United States,*
    281 F.3d 1234 (Fed. Cir. 2002) ...................................................................... 9

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................. 8, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................... 8

*Bell v. United States,*
    123 Fed. Cl. 390 (2015) .............................................................................. 19

*Caldwell & Santmyer, Inc. v. Glickman,*
    55 F.3d 1578 (Fed. Cir. 1995) ................................................................ 9, 10

*Christian v. United States,*
    46 Fed. Cl. 793 (2000) ................................................................................ 19

*Coastal Corp. v. United States,*
    6 Cl. Ct. 337 (1984) .................................................................................... 12

*Cooke v. United States,*
    1 Cl. Ct. 695 (1983) .................................................................................... 19

*CPS Mech. Contractors, Inc. v. United States,*
    59 Fed. Cl. 760 (2004) ................................................................................ 16

*Gadsden v. United States,*
    78 F. Supp. 126 (1948) ................................................................................. 9

*John Reiner & Co. v. United States,*
    325 F.2d 438, 163 Ct. Cl. 381 (1963) ..................................................... 9, 13

*Kalvar Corp., Inc. v. United States,*
    211 Ct. Cl. 192, 543 F.2d 1298 (1976) ................................................... 9, 13

*Keco Indus., Inc. v. United States,*
    492 F.2d 1200 (1974) .................................................................................. 13

*Krygoski Constr. Co., Inc. v. United States,*
    94 F.3d 1537 (Fed. Cir. 1996) ......................................................... 9, 10, 13

*Librach v. United States,*
   147 Ct. Cl. 605, 1959 WL 7633 (1959) ................................................................. 9

*McDonnell Douglas Corp. v. United States,,*
   182 F.3d 1319 (Fed. Cir. 1999) .......................................................................... 12

*Modeer v. United States,*
   68 Fed. Cl. 131 (2005) ................................................................................... 16

*Northrop Grumman Corp. v. United States,*
   46 Fed. Cl. 622 (2000) ................................................................................... 12

*Road & Highway Builders, LLC v. United States,*
   702 F.3d 1365 (Fed. Cir. 2012) ........................................................................... 9

*Robert F. Simmons & Assocs. v. United States,*
   175 Ct. Cl. 510 (1966) ................................................................................... 12

*Salsbury Indus. v. United States,*
   905 F.2d 1518 (Fed. Cir. 1990) ...................................................................... 9, 10

*Sommers Oil Co. v. United States,*
   241 F.3d 1375 (Fed. Cir. 2001) ........................................................................... 8

*Torncello v. United States,*
   231 Ct. Cl. 20, 681 F.2d 756 (1982) ..................................................................... 9

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ..................................................................................... 18

Statutes

41 U.S.C. §  601 et seq. .................................................................................... 16

Rules

RCFC 12(b)(6) ............................................................................................. 8

RCFC 23(a) .............................................................................................. 18

RCFC 23(b) ........................................................................................... 18, 20

Regulations

48 C.F.R. §  52.233–1(c) ................................................................................... 16

FAR 52.233-1 ............................................................................................ 16

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |
|---|---|
| ANDREA DANZIGER, DEBORAH MURPHY, MARK HERZBERG, KENNETH SKLAW,<br><br>                    Plaintiffs,<br><br>        v.<br><br>THE UNITED STATES,<br><br>                    Defendant. | No. 25-1241<br>(Judge Tapp) |

## <u>DEFENDANT'S MOTION TO DISMISS</u>

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the complaint filed by plaintiffs, Andrea Danziger, Deborah Murphy, Mark Herzberg, and Kenneth Sklaw on behalf of themselves and similarly situated plaintiffs, for failure to state a claim upon which relief may be granted.  Plaintiffs failed to sufficiently allege a claim of "bad faith" in the termination for convenience of their personal services contract for the United States Agency for International Development (USAID) because they have not alleged any personal animus or intent to injure by the contracting officer who terminated their contracts or the agency official under whose policy guidance those decisions were made.  Likewise, they have failed to allege a breach of the termination for convenience clause because the complaint makes clear that all costs due to each plaintiff under each respective termination clause have been paid and, accordingly, there are no damages that this Court could award.  Thus, we move to dismiss plaintiffs' Amended Complaint, ECF No. 14 (Am. Compl.).

In the alternative, to the extent that the Court determines that a motion to dismiss some or all of the allegations in the amended complaint is not warranted, we would respectfully request that the Court grant the Government an additional 14 days within which to respond to plaintiff's amended complaint.

## BACKGROUND

Ms. Danziger, Ms. Murphy, Mr. Herzberg and Mr. Sklaw all are former contractors for the United States Agency for International Development (USAID), through Personal Services Contracts (PSC), though each served under a different position with distinct responsibilities. *See* Am. Compl. at 9 (¶ 25), 10-11 (¶34), 11 (¶ 42), and 12 (¶49). Beginning in early February 2025, leadership at USAID announced they would review the operations of USAID in order to better align its work with new policy goals. *See* Compl. Ex. C (ECF No. 1-4) at 2-3[1] (¶¶ 5-6) (Decl. Jeremy Lewin).[2] This review included personnel actions and contract award review, and eventually included the staggered terminations of certain PSC contracts over the course of three months. Am. Compl. at 2. The agency ultimately terminated PSCs in high-income and medium income countries that did not meet certain criteria, because "USAID's mandate is to assist primarily in low-income countries" and providing assistance in higher-income countries "diverts resources away from helping people progress beyond the need for aid." Am. Compl. Ex. D (ECF No. 11-5) at 4 (Action Memo for Secretary of State Rubio, February 2, 2025).

---

[1] All pinpoint citations to plaintiffs' exhibits refer to the ECF page number.

[2] Plaintiffs' amended complaint referenced as an exhibit a portion of Mr. Lewin's declaration – available on the docket attached to the original complaint at ECF No. 1-4 – but they appear to have inadvertently omitted several pages of that declaration when referencing it as an exhibit to their amended complaint as ECF No. 11-4. Thus, we refer here to the original exhibit.

All of the named plaintiffs claim they were terminated through the termination for convenience clause in their PSCs, and each of them seek compensation for costs which they claim are due under that clause or, in the alternative, for the entire value of their contract as if the each contract were fully performed.  In each such case, the claims as alleged in the amended complaint and through documents appended by reference, instead show that each plaintiff received the compensation that they were due under the termination for convenience clause, and that bad faith in their termination has not been sufficiently alleged to warrant any further relief.

I.    **Termination For Convenience Cost Claims**

A.  **The Termination for Convenience Clause**

The PSCs for all named plaintiffs include the same provision describing the effects of a termination for convenience.  Am. Compl. at 8 (¶21).  That provision required that the Government provide 15-days notice of termination, after which time the contractor lost any right to compensation except for "unused vacation leave" and certain return transportation and travel costs:

> (16)(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part:
> …
> (2) For the convenience of USAID, by giving not less than 15 calendar days advance written notice to the contractor. Upon such a termination [for convenience], ***contractor's right to compensation shall cease when the period specified in such notice expires except*** that the contractor shall be entitled to any unused vacation leave, return transportation costs and travel allowances and transportation of unaccompanied baggage costs at the rate specified in the contract and subject to the limitations which apply to authorized travel status.

Am. Compl. at 8 (¶21) and 9 (¶26) (emphasis added); *see also* Am. Compl. Exs. M at 42, N at 39, O at 30 and P at 40.  As detailed below, none of the named plaintiffs allege that they are due compensation for "unused vacation leave," or for return transportation or travel costs.  *See* Am. Compl. at 9-13 (¶¶ 25-55).

### B. Plaintiff Andrea Danziger

On February 19, 2025, Ms. Danziger, who was a humanitarian assistance officer working under a PSC, received a notice of the termination for convenience of her contract. Am. Compl. at 3 (¶ 2), 8-9 (¶25). Ms. Danziger's contract, which was awarded on November 19, 2023, would have run through November 18, 2028, absent termination. Am. Compl. at 9 (¶ 25). The termination notice provided that "termination will be 15 days from the date of this notification," and identified Ms. Danziger's last day of work as March 6, 2025. Am. Compl. Ex. A (ECF No. 11-2) at 2. The notice was signed by a Supervisory Contracting Officer. *Id.* Ms. Danziger requested additional information about this notice, raised concerns about it, requested compensation, and asked for an extension of her termination date. *See* Am. Compl. at 10 (¶ 29). On March 6, 2025, a contracting officer notified Ms. Danziger that her termination date was extended to April 20, 2025. Am. Compl. at 10 (¶ 30), Am. Compl. Ex. Q (ECF No 11-18) at 2

On April 15, 2025, Ms. Danziger submitted a certified claim, seeking termination costs in the amount of $660,961.63, which included $18,553.73 in "[u]nused leave," $1,529.90 in "[o]ther costs" that were "already submitted for Government review and approval via Public Vouchers," and $640,878 in "[l]ost [c]ompensation." Am. Compl. Ex. F (ECF No. 11-7) at 4-5. Ms. Danziger's "[u]nused leave" calculation included both annual leave accrued, which she valued at $14,667.89, and sick leave accrued, which she valued at $3,887.25. *See id.* at 4. Ms. Danziger also "reserve[d] the right to supplement" her claim because she "expect[ed] to incur relocation costs as a result of the termination." *Id.* at 5. Ms. Danziger provided no information about the basis for such "relocation" costs or any quantum by which such costs could be calculated. *Id.*

4

In response to Ms. Danziger's claim, the agency issued two payments. On May 16, 2025, Ms. Danziger was paid $1,529.90, the full amount of the "other costs" her claim included. Exhibit A (Danziger Payment Transaction Record); *see also* Am. Compl. at 10 (¶ 32) (acknowledging that Ms. Danziger "received payment of her outstanding Standard Form (SF) 1034, the Public Voucher for Purchases and Services Other Than Personal, that was pending at the time of termination."). On June 5, 2025, Ms. Danziger was paid for her annual leave, which the agency valued at $15,789.98. Ex. A; *see also* Am. Compl. 10 (¶ 32) (acknowledging that Ms. Danziger "received a lump sum payment reflecting only her annual-leave costs"). Ms. Danziger was not paid for "lost compensation" or "relocation."

### C. Plaintiff Deborah Murphy

On March 3, 2025, Ms. Murphy, who was regional humanitarian program officer working under a PSC, received a notice of the termination for convenience of her contract. Am. Compl. at 11 (¶ 36). Ms. Murphy's contract was originally awarded on November 28, 2023, and absent termination it would have run through December 30, 2028. Am. Compl. at 10-11 (¶ 34). The termination notice provided 15-days notice and identified Ms. Murphy's last day of work as March 18, 2025. Am. Compl. at 11 (¶ 37). The notice was signed by a Contracting Officer. Am. Compl. Ex. G (ECF No. 11-8) at 2. On March 7, 2025, Ms. Murphy's termination date was revised to be April 17, 2025. Am. Compl. at 11 (¶ 38).

Ms. Murphy's June 16, 2025 certified claim sough sought termination costs in the amount of $974,183.01, which included $59,175.91 in "[u]nused leave." Am. Compl. Ex. H (ECF No. 11-9) at 4. Ms. Murphy's "[u]nused leave" calculation included annual leave accrued, which she valued at $28,058.16, sick leave accrued, which she valued at $29,708.64, and "regulatory compensatory time," which she valued at $1,581.71. *See id.* Ms. Murphy did not

allege that she undertook any steps to convert her claim of compensatory time to a payment owed.  *Id.*  The remainder of Ms. Murphy's claim was comprised of $915,183.01 in "[l]ost [c]ompensation," which reflected her calculation of "wages, benefits and incidental earnings" for the portion of her contract which was not performed due to the termination for convenience. Am. Compl. Ex. H at 4-5.  Ms. Murphy did not allege that she had submitted any claims for compensation of costs under Public Vouchers prior to her termination, nor was any such cost reflected in her certified claim.  *Id.*

In response to her claim, Ms. Murphy admits that she "received a lump sum payment" from the agency in full compensation for her annual leave.  Am. Compl. at 11 (¶ 40).

### D.  Plaintiff Mark Herzberg

On April 3, 2025, Mr. Herzberg, who was performing a PSC as Deputy Executive Officer in USAID's Executive Office, received a notice of the termination for convenience of the Government.  Am. Compl. at 11-12 (¶¶ 42, 44).  Mr. Herzberg's contract was awarded on June 22, 2022, and absent termination it would have run through June 23, 2027.  Am. Compl. at 11-12 (¶ 42).  Mr. Herzberg's termination notice provided 15 days notice and indicated his last day of employment would be September 2, 2025.  Am. Compl. at 12 (¶ 45).  The notice was signed by a Supervisory Contracting Officer.  Am. Compl. Ex. I (ECF No. 11-10) at 3.

Mr. Herzberg's August 8, 2025 certified claim sought $445,617.57, based upon "[l]ost [c]ompensation" ($331,023.57), and unused sick leave ($114,594).  Am. Compl. Ex. J (ECF No. 11-11) at 3.  Mr. Herzberg did not allege that he had submitted any claims for compensation of costs under Public Vouchers prior to his termination, nor was any such cost reflected in his certified claim.  *Id.*

Mr. Herzberg admits that he received a lump sum payment from the agency on October 8, 2025, reflecting his annual leave costs.  Am. Compl. at 12 (¶ 47).

### E.  Plaintiff Kenneth Sklaw

On February 19, 2025, Mr. Sklaw, who was working under a PSC as a global health development specialist, received a notice of the termination for convenience of his contract.  Am. Compl. at 12-13 (¶¶ 49, 51).  Mr. Sklaw's contract was awarded on August 24, 2022, and absent termination would have continued through August 28, 2027.  Am. Compl. at 12 (¶ 49).  The termination notice provided Mr. Sklaw with more than 15-days notice, and his last day of employment was to be March 6, 2025.  Am. Compl. at 3 (¶ 52).  The notice was signed by a Contracting Officer.  Am. Compl. Ex. K (ECF No. 11-12) at 2.

Mr. Sklaw's September 12, 2025 certified claim sought $141,140.80, based upon "[l]ost [c]ompensation" ($133,326.07), and unused sick leave ($7,814.73).  Am. Compl. Ex. L (ECF No. 11-13) at 3.  Mr. Sklaw did not allege that he had submitted any claims for compensation of costs under Public Vouchers prior to his termination, nor was any such cost reflected in his certified claim.  *Id.*

Mr. Sklaw admits that he received a lump sum payment from the agency on May 29, 2025, reflecting his annual leave costs.  Am. Compl. at 13 (¶ 54).

## II.    Bad Faith Claims

All of the plaintiffs allege that the agency terminated PSC contracts "in abuse of discretion and bad faith" because they "unlawful[ly] dismantle[ed] a Congressionally-established independent agency" under pretext while "exhibiting animus and malice toward the PSC contractors that served USAID."  Am. Compl. at 34 (¶ 143) (Count I).  In addition, the named

plaintiffs propose to represent all "similarly situated" PSC contractors who received USAID termination notices between February 12, 2025, and April 24, 2025.  *See* Am. Compl. at 5 (¶ 12).

As we demonstrate below, the plaintiffs have failed to sufficiently allege a breach of contract claim, either for termination of their PSCs in bad faith, or failure to pay costs required under the termination for convenience clause in those contracts.  Moreover, the plaintiffs have not sufficiently pled that other PSCs terminated are similarly situated, so a class action is not warranted.  Accordingly, we respectfully ask that this Court dismiss the amended complaint.

<strong>ARGUMENT</strong>

**I.    The Platiniffs' Complaint Fails to Allege a Claim For Which Relief Can be Granted.**

**A.  Standard of Review**

Pursuant to RCFC 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted" unless it alleges facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief."  *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  In assessing the complaint, the Court "must accept as true all factual allegations, and . . . indulge all reasonable inferences in favor of the non-movant."  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).  But the Court is not required to accept legal conclusions couched as factual allegations.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

**B.  The Plaintiffs Fail to Sufficiently Allege "Bad Faith" or "Abuse of Discretion" in the Termination of Their Contracts.  (Count I)**

The named plaintiffs fail to sufficiently allege that the termination of their contracts were motivated by bad faith or were the result of an abuse of discretion, and instead invite this Court to weigh into the motivations of political decisions reached by the executive branch about the

8

organization and priorities of USAID. *See generally*, Am. Compl. at 13-34 (¶¶56-141). This Court should decline that invitation.

First, in order to demonstrate bad faith, plaintiffs must present "'well-nigh irrefragable proof'" that the government had a specific intent to injure the plaintiff. *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (quoting *Torncello v. United States*, 231 Ct. Cl. 20, 45, 681 F.2d 756 (1982)); *accord Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368-69 (Fed. Cir. 2012) (requiring clear and convincing evidence of a specific intent to injure the plaintiff). This is because we assume the government acts in good faith when contracting. *Torncello*, 681 F.2d at 770; *Kalvar Corporation, Inc. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976); *Librach v. United States*, 147 Ct.Cl. 605, 1959 WL 7633 (1959). Indeed, "[i]t is not the province of the courts to decide de novo whether termination was the best course; instead, "the contracting officer's election to terminate is conclusive" absent bad faith. *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990) (quoting *John Reiner & Co. v. United States*, 325 F.2d 438, 442, 163 Ct.Cl. 381 (1963)).

The Federal Circuit has described the contractor's burden in proving bad faith is "weighty." *Krygoski Constr. Co., Inc. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir. 1996). Contractors rarely have succeeded in meeting that high burden. *Kalvar*, 543 F.2d at 1301 (citations omitted). Allegations of bad faith must evince a "specific intent to injure" and "animus" toward the opposing party in terminating the contract. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (quoting *Kalvar Corp. v. United States*, 211 Ct. Cl. 192, 199, 543 F.2d 1298 (1976)); *Gadsden v. United States*, 78 F.Supp. 126, 127 (1948) (finding bad faith when actions are "motivated alone by malice."). Rarely, courts have also sustained allegations of bad faith when the Government terminated for convenience in order

to "escape a promise [the Government] never had an intention to keep." *Krygoski Constr.*, 94 F.3d at 1541-42 (citing *Torncello*, 681 F.2d at 772).  But in such cases, the plaintiff must establish that the government knew it would not honor the contract at the time of formation.  *See Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1582 (Fed. Cir. 1995) (citing *Salsbury Indus. v. United States*, 905 F.2d 1518, 1521 (Fed. Cir. 1990)).

The plaintiffs have neither alleged that the contracting officer terminating their contracts did so with a specific intention to injure them, nor have they alleged that the agency did not intend to honor those contracts at the time they were issued.  Rather, the plaintiffs rely on allegations that various members of the Government made public statements casting aspersions on the agency for which they worked, claiming that USAID was "corrupt" and "wasting taxpayer dollars," among other statements.  *See* Am. Compl. at 24 (¶ 102), 22-23 (¶¶ 95, 96).  Plaintiffs then make the leap that "[b]ased on the nature of the PSC contractors' work *and the closeness in time of these Government statements to the termination of Plaintiffs' contracts*" they demonstrate animus or malice in the execution of those terminations.  Am. Compl. at 32 (¶ 133) (emphasis added).  But while plaintiffs identify some harsh statements made about USAID, none of the statements they reference were made by the individuals who ultimately made the decision to terminate their contracts, nor were those statements directed at plaintiffs.  Rather, they allege that the PSC terminations were approved by Peter Marocco, Deputy Administrator of USAID, and they offer in support as an exhibit to their amended complaint a February 2, 2025 email from Mr. Marocco directing the terminations personally.  *See* Am. Compl. Ex. D (ECF No. 11-5) at 2 (February 2, 2025 email from Peter Marocco forwarding an "Action Memo" drafted for Secretary of State Marco Rubio) ("Please immediately execute the comprehensive option of termination of both level of PSC contracts.").  Further, to the extent that plaintiffs allege that it

was Secretary of State Rubio whose review provided the basis for Mr. Marocco's direction, Am. Compl. at 29 (¶¶ 119-120), plaintiffs still cannot establish bad faith.  This is the case because the plaintiffs do not allege that any statements by Mr. Marocco, Secretary Rubio[3] or the contracting officers who signed each plaintiffs' notification of termination suggest a personal animus or specific intent to injure any plaintiff or PSC contractor.

Moreover, while plaintiffs characterize the agency decision-maker's stated rationale for these terminations as "post hoc," and "pretextual," neither characterization is consistently pled. *See* Am. Compl. at 23 (¶78).  Rather, the February 2, 2025 email and memorandum directing the termination of certain PSC contracts, which plaintiffs append to their complaint, *precedes* the termination letters.  *Compare* Am. Compl. Ex. D, to, *e.g.,* Am. Compl. Ex. A (February 19, 2025 Danziger Termination Notice).  In the February 2, 2025 Action Memorandum, the agency explained that it intended to terminate "personal services contract[s]" that provide service in "high-income and medium-income countries" that do not meet certain thresholds because USAID had determined that it should instead focus its resources on "assist[ing] primarily in low-income countries."  Am. Compl. Ex. D at 4.  The plaintiffs suggest that this goal reflected a "fundamental misunderstanding of USAID operations," Am. Compl. at 26 (¶ 108), but even if that allegation were true, "misunderstanding" is not sufficient to demonstrate "bad faith."

---

[3]  The strongest statement the plaintiffs attribute to Secretary Rubio outside of the "Action Memo" which officially describes the basis for PSC terminations, is that the Secretary observed "rank insubordination" at the agency, generally.  Am. Compl. at 24 (¶ 101).  But the article on which plaintiffs rely for this statement does not identify any link between Secretary Rubio's comment about the agency and any decision to terminate the PSCs in particular.  *See* Am. Compl. at 24, n.34 (*citing* Ashleigh Fields, *Rubio Accuses USAID of "Rank Insubordination*," The Hill (Feb. 4, 2025), available at: https://thehill.com/policy/international/5124933-marco-rubio-usaid-overhaul-rank-insubordination/).

Further, even if the Court were to accept the plaintiffs' argument that decisions of the executive branch to reorganize or dismantle USAID were themselves taken in bad faith, that would not translate to bad faith on the part of the contracting officer in terminating the plaintiffs' contracts. Both the Federal Circuit and this court have in the past recognized a difference between a general decision about the fate of a particular program or agency, and the specific contracting officer's decision to terminate a contract. *E.g., McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1328-29 (Fed. Cir. 1999) (distinguishing Secretary of Defense's decision not to award extraordinary relief from contracting officer's termination decision). For instance, in the late nineties, NASA reorganized its Space Station Program, which had the necessary effect of requiring the agency to revisit the contracts which supported that Program. But in that case "NASA was not seeking 'simply' to remove plaintiff from this program and to replace it" with a competitor in bad faith; instead, "the entire Program was being scaled down." *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 627-628 (2000); *see also Robert F. Simmons & Associates v. United States*, 175 Ct. Cl. 510, 516 (1966) (no bad faith in a GSA decision declining to consider the merits of a particular bid, when all bids were cancelled following a change in appropriations for the agency); *Coastal Corp. v. United States*, 6 Cl. Ct. 337, 383-84 (no bad faith or abuse of discretion in a DOE decision to reject all bids in favor of government facilities in response to changed foreign policy objectives). Accordingly, the termination for convenience of Grumman's contract was a consequence of a change in a government program, but the Court recognized that there was "no evidence that NASA had reason to treat Grumman differently from anyone else." *Id.* Such is the case here. The plaintiffs' terminations were the result of the reorganization of USAID, but their contracts were not treated any differently than the other personal service contracts that fell within the change in policy.

Second, while the plaintiffs allude to "abuse of discretion" as an alternative to "bad faith" termination here, there is no clear legal test for abuse of discretion without a finding of bad faith. Rather, "many of [Court of Federal Claims] prior decisions seem implicitly to accept the equivalence of bad faith, abuse of discretion, and gross error." *Kalvar*, 543 F.2d at 1301, n1. Indeed, the Federal Circuit has also appeared to recognize that "the procurement official's bad faith" is one of the standards for finding that abuse of discretion is present. *See Krygoski Const.*, 94 F.3d at 1543 (quoting *John Reiner*, 325 F.2d at 442, and referencing the *Keco* standards, *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-1204 (Ct. Cl. 1974)). Critically, in this case, the plaintiffs have not actually alleged that the procurement officials who terminated their PSC contracts were acting in bad faith. The plaintiffs cite no statement from any contracting officer to suggest animus or pretext, and so fall far short of meeting the high burden to plead abuse of discretion.

### C. The Plaintiffs Do Not Sufficiently Allege That the Government Breached the Termination Clause of Their Contracts, as They Admits Costs Which Are Due Under That Clause Have Been Paid. (Count II)

The plaintiffs allege that the Government breached the termination for convenience clause in their contracts, which required the payment of "various termination costs including unused leave costs, relocation costs, travel allowances, material/equipment costs, and other outstanding reimbursements." Am. Compl. at 8 (¶21) and 9 (¶26); *see also* Am. Compl. Exs. M at 42, N at 39, O at 30 and P at 40. The plaintiffs are mistaken about the costs due under their contracts, but to the extent they identify costs for which they are entitled to compensation, they admit such costs have already been paid by the Government.

The plain language of the plaintiffs' contracts limits the categories of compensation for which they are entitled following Termination for Convenience.  Specifically, all of the plaintiffs' contracts provide the following guidance about costs due:

> Upon such a termination [for convenience], contractor's right to compensation shall cease when the period specified in such notice expires except that the contractor shall be entitled to any unused vacation leave, return transportation costs and travel allowances and transportation of unaccompanied baggage costs at the rate specified in the contract and subject to the limitations which apply to authorized travel status.

Am. Compl. at 8 (¶21) and 9 (¶26); *see also* Am. Compl. Exs. M at 42, N at 39, O at 30 and P at 40.

First, this provision requires that the Government pay personal service contractors for unused vacation leave.  But the plaintiffs all agree that they "received a lump sum payment[s]" which covered all annual-leave costs.  *See* Am. Compl. at 10 (¶¶ 31-32), 11 (¶ 40), 12 (¶ 47), and 13 (¶ 54).  For example, in her certified claim, Ms. Danziger stated that her claim included accrued annual leave in the amount of 283 hours which she valued at an effective hourly pay rate of $51.83.  Am. Compl. Ex. F at 4.  Applying that calculation, she valued her annual leave at $14,667.89, but the Government paid out annual leave in the amount of $15,789.98 on June 5, 2025.  *See* Ex. A (Payment Transaction Record).  To the extent that Ms. Danziger is seeking payment for her sick leave balance, the plain language in the termination clause only requires the payment of unused *vacation* leave, and the contract otherwise confirms that "[t]he contractor will not be compensated for unused sick leave at the completion of this contract," Am. Compl. Ex. M at 26 (¶(5)(b)), so no further leave payment is warranted.  The other plaintiffs similarly allege they are due compensation for sick leave, but the termination for convenience clause authorizes no payment for such claims, and all of the plaintiffs' contracts prohibit such payment at the end

of the contract. *See, e.g.*, Am. Compl. Ex. N at 23 (¶5(b)); Am. Compl. Ex. O at 17 (¶5(b)); Am. Compl. Ex. P at 23 (¶5(b)). Likewise, Ms. Murphy alleges that she is due compensation for "regulatory compensatory time," but she does not allege that she undertook any steps to convert compensatory time into a payment owed, and her contract does not authorize such a payment upon a termination for convenience without such steps. *See* Am. Compl. Ex. P at 25 (¶ 5(h)). No plaintiffs allege that the Government has failed to pay them for unused *vacation* leave.

Second, Ms. Danziger alone claims that she was not paid for "outstanding compensation and reimbursements." Am. Compl. at 10 (¶ 29). While she failed to describe these costs in her complaint or allege a contract provision that required payment of such costs, her certified claim alleged health insurance reimbursables, professional liability insurance and Arabic language training costs "were submitted for Government review and approval via Public Vouchers for Purchases and Services Other Than Personal (SF 1034s) that remain outstanding," in the amount of $1,529.90. Am. Compl. Ex. F at 5. But again Ms. Danziger's pleading confirms that she "also received payment of her outstanding Standard Form ("SF") 1034, the Public Voucher for Purchases and Services Other Than Personal, that was pending at the time of termination." Am. Compl. at 10 (¶ 32). We can also confirm that Ms. Danziger was paid on May 16, 2025, for such reimbursements, which totaled $1,529.90. Ex. A (Danziger Payment Transaction Record).

Third, Ms. Dazinger is also the only named plaintiff who alleges that she was due "relocation" costs. Am. Compl. at 10 (¶ 31), Am. Compl. Ex. F at 5. The termination for convenience clause does not require reimbursement for "relocation" cost but, rather, "*return* transportation costs and travel allowances and transportation of unaccompanied baggage costs" which are conditioned on "limitations which apply to authorized travel status." Am. Compl. Ex. M at 42 (¶16(a)(2)); *see also* Am. Compl. at 8 (¶21). The plain language of the contract further

confirms that the contractor may be reimbursed for travel expenses "incurred under the performance of this contract," as well as international travel costs "from a place of residence in the United States . . . to the post of duty in the Cooperating Country and return to a place of residence in the United States."  Am. Compl. Ex. M at 35-36 (¶ 10 (a)(2), (c)).  Ms. Danziger's contract designates her official worksite as Washington D.C.  *Id*. at 13 (Article II).  Ms. Danziger admits that she was "based in the United States" for the performance of her work under this contract, identifies no travel costs that were pending reimbursement at the time of her termination, and does not allege she was on travel or located in a Cooperating Country when she was terminated.  *See* Am. Compl. at 16 (¶ 72).  In her certified claim, Ms. Danziger explains only that she, prospectively, "expects to incur relocation costs as a result of the termination," but provides no basis for such a claim, which is not supportable under her contract.  Am. Compl. Ex. F at 5.

Moreover, Ms. Danziger's contract requires that any claim submitted must include a written demand for "the payment of a money in a sum certain," Am. Compl. Ex. M at 55 (incorporating FAR 52.233-1 (c)), but Ms. Danziger's statement that she "expects to" incur future relocation costs does not provide the agency notice of the basis for or the amount of her claim.  *See* Contract Disputes Act of 1978, §  2 et seq., 41 U.S.C. §  601 et seq.;  48 C.F.R. § 52.233–1(c); *see also CPS Mech. Contractors, Inc. v. United States*, 59 Fed. Cl. 760 (2004) (rejecting claim where the contractor failed to identify a dollar figure or documentation that could be used to calculate a dollar figure); *Modeer v. United States*, 68 Fed. Cl. 131 (2005), *affirmed* 183 F.App'x 975, 2006 WL 1582178 (Fed. Cir. 2006) (the "sum certain" requirement for a claim is met when the contracting officer can determine the amount claimed by a simple

mathematical calculation). Accordingly, Ms. Danziger has not sufficiently alleged any entitlement to "relocation" or "return transportation" costs.

Finally, all named plaintiffs seek to be paid the full balance of the remaining years of work on their contracts as "lost compensation." Am. Compl. at 3. They do not support that claim with any allegation that their contracts required such payment. To the contrary, the contracts expressly state that the "contractor's right to compensation shall cease when the period specified in such [termination] notice expires . . ." and excepts from that guidance only the costs already examined above. *See* Am. Compl. at 8 (¶21) and 9 (¶26); *see also* Am. Compl. Exs. M at 42, N at 39, O at 30 and P at 40. The plaintiffs appear to argue that payment for work not performed under the contract is warranted because the Government terminated their contracts in bad faith. As we demonstrate above, plaintiffs fail to sufficiently allege – let alone establish – bad faith in their pleadings. Rather, plaintiffs improperly conflate Executive Branch decisions concerning agency organization with how the Government implemented these decisions vis-à-vis existing contracts. As this Court and the Federal Circuit have consistently observed, those are separate actions, and this Court is only concerned with whether the contracting officer properly invoked the Government's contractual rights consistent with the terms of the applicable contract. In sum, the plaintiffs allege no basis for entitlement to costs other than those for which they have already been paid.

**D.  The Named Plaintiffs Have Failed to Sufficiently Allege a Class Action or That They Are "Similarly Situated" to All Other PSC Contractors[4]**

The named plaintiffs allege that they represent a class of PSCs "performing work for USAID" whose contracts were terminated between February 12, 2025, and April 24, 2025.  Am. Compl. at 5 (¶5).  This sweeping definition does not sufficiently allege a class action under the Rules of the Court of Federal Claims (RCFC) 23(a) or 23(b).  As a prerequisite to establishing a class action, the rules require and the plaintiff must allege that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

RCFC 23(a).  Ultimately, the plaintiffs must also show that "the United States has acted or refused to act on grounds generally applicable to the class," and "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  RCFC 23(b)(2)-(3).  But the Court is not required to accept legal conclusions couched as factual allegations.  *See Ashcroft v. Iqbal*, 556 U.S. at 678 (citation omitted).  The party seeking certification bears the burden of establishing that the requirements of RCFC 23 have been met by a preponderance of the evidence.  *See Wal-Mart Stores, Inc. v.*

---

[4] Since the filing of the amended complaint, the plaintiffs have moved for "Class Action Certification."  *See* ECF No. 14.  The Government will timely respond to that motion separately; in this motion we address only the allegations relevant to this issue that are raised by plaintiffs' amended complaint.

*Dukes*, 564 U.S. 338, 350 (2011); *see also Bell v. United States*, 123 Fed. Cl. 390, 395 (2015). "Class certification is at the discretion of the trial court." *Bell*, 123 Fed. Cl. at 395 (collecting cases).

The plaintiffs have not made allegations sufficient to meet this burden. Courts have declined to certify a class when potential class members have different fact issues affecting damages. *See, e.g., Cooke v. United States*, 1 Cl. Ct. 695, 699 (1983) (denying class certification because dissimilar factual issues regarding damages failed to meet the typicality requirement); *Christian v. United States*, 46 Fed. Cl. 793, 816 (2000) (partially denying class certification because plaintiff's claims turned in part upon particular career field and skill, and, therefore, typicality criteria was not met). Ms. Danziger, Ms. Murphy, Mr. Herzberg and Mr. Sklaw seek to represent all PSCs "performing work" for USAID, no matter what the nature of their work might have been or where it was performed. But differences such as the duties of the PSC, GS level, years of service, compensation, the location served by the PSC, the location at which the PSC was stationed, the types of costs that may be reimbursed, the potential costs for family members, differentials or allowances due, the calculation of leave, and travel costs may differ widely among PSCs. Indeed, none of the four named plaintiffs – out of an alleged "hundreds" of potential class members – even have the same job description. *See* Am. Compl. at 9 (¶ 25), 10-11 (¶ 34), 11-12 (¶ 42), 12 (¶ 49) (describing Ms. Danziger as a "Humanitarian Assistance Officer, Ms. Murphy as a "Senior Regional Humanitarian Program Officer," Mr. Herzberg as a Deputy Executive Officer," and Mr. Sklaw as a "Global Health (Rover IV) Health Development Specialist."). The responsibilities listed in each plaintiffs' contracts likewise suggest some plaintiffs have supervisory authority and some do not. *Compare, e.g.,* Am. Compl. Ex. M at 6-12 (Ms. Danziger's roles and responsibilities) with Am. Compl. Ex. K at 6-7 (Mr. Herzberg's

"Major Duties").  All four plaintiffs were employed at different locations – some abroad and some domestic.  *See* Am. Compl. at 11 (¶ 34 and 38) (acknowledging many PSCs are stationed overseas, though Ms. Danziger and Mr. Sklaw were not).  The location of a PSC in a host country can have a significant impact on what costs they may be owed under their contract.  *See, supra* at 15 (discussing Ms. Danziger's lack of entitlement to return travel costs).  If the plaintiffs anticipate "hundreds" of class members, one could expect these distinctions to multiply considerably.

Further, the plaintiffs admit that PSC contracts were not terminated in one tranche, but over a period of months, potentially for different reasons, which is significant considering that the plaintiffs argue that the "closeness in time" between statements made by various Government actors about USAID and the termination decisions is the linchpin of her legal argument.  *See* Am. Compl. at 32 (¶ 133).  The plaintiffs acknowledge that the termination notices issued for PSCs differed in their characterization of the basis for termination (which plaintiffs call "updated boilerplate language").  *See* Am. Compl. at 31 (¶ 125).  They also allege that termination notices were issued by different contracting officers, and suggest "many" – though not all – were "not issued by the cognizant COs who were responsible for administering and had authority over the respective contracts."  *Id.* at ¶ 126.  All of these differences suggest factual and legal issues that may develop differently across differently-situated PSCs, and cannot be overcome by the largely conclusory allegations with which the named plaintiffs seek to allege class action status.

Finally, the plaintiffs fail to allege that "the United States has acted or refused to act on grounds generally applicable to the class."  RCFC 23(b)(2).  In this case, the plaintiffs failed to sufficiently allege bad faith or abuse of discretion, and they also failed to allege costs due under the termination for convenience clause were not paid under some commonly-applied

Government policy.  Lacking such allegations, there is no Government harm for which plaintiffs have alleged that a group of PSCs may seek relief, and so they fail to allege a class.

## CONCLUSION

For the foregoing reasons, we respectfully request that our motion to dismiss be granted, and that the plaintiffs' complaint be dismissed for failure to state a claim on which relief may be granted.  To the extent that the Court determines that a motion to dismiss this Complaint is not warranted for all allegations, we would respectfully request that the Court grant the Government an additional 14 days to respond to the plaintiffs' amended complaint.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

OF COUNSEL                        /s/ Stephanie A. Fleming
Rachel B. Cochran                 STEPHANIE A. FLEMING
Assistant General Counsel         Trial Attorney
U.S. Agency for Int'l Development Commercial Litigation Branch
                                  Civil Division
                                  U.S. Department of Justice
                                  P.O. Box 480, Ben Franklin Station
                                  Washington, DC 20044
                                  Telephone: (202) 616-0170
                                  Facsimile: (202) 305-2062
                                  Stephanie.Fleming@usdoj.gov

                                  *Attorneys for Defendant*

Dated: December 9, 2025